# COMMONWEALTH OF MASSACHUSETTS
## EXECUTIVE OFFICE OF ENERGY & ENVIRONMENTAL AFFAIRS
## DEPARTMENT OF ENVIRONMENTAL PROTECTION
ONE WINTER STREET, BOSTON, MA 02108  617-292-5500

## THE OFFICE OF APPEALS AND DISPUTE RESOLUTION

**June 16, 2017**

In the Matter of                                    OADR Docket No. WET-2015-016
Gooseberry Island Trust and              DEP File No. SE-43-2773
SN Trust                                              Mashpee, MA

## RECOMMENDED FINAL DECISION

## INTRODUCTION

The Gooseberry Island Trust and the SN Trust (collectively "the Petitioners") originally

filed this appeal challenging a Superseding Order of Conditions ("SOC") that the Southeast

Regional Office of the Massachusetts Department of Environmental Protection ("MassDEP" or

"the Department") issued to the Petitioners pursuant to the Massachusetts Wetlands Protection

Act, G.L. c. 131, § 40 ("MWPA") and the Wetlands Regulations, 310 CMR 10.00 et seq. ("the

Wetlands Regulations") denying their proposed construction of a timber bridge extending from 0

Punkhorn Point Road in Mashpee, Massachusetts ("Mashpee") across a narrow channel of water

to Gooseberry Island in Mashpee ("the original proposed Project").  SOC, at pp. 1-2.  The

proposed timber bridge was to be an 11 feet wide by 200 feet long structure supported by thirty-

nine 14 inch diameter timber piles that was to provide vehicular and pedestrian access from the

This information is available in alternate format. Call Michelle Waters-Ekanem, Diversity Director, at 617-292-5751. TDD# 1-866-539-7622
or 1-617-574-6868
MassDEP Website: www.mass.gov

 Printed on Recycled Paper

Mashpee mainland to Gooseberry Island. <u>Id</u>. The proposed timber bridge was also to facilitate

the Petitioners' construction of a single family home on Gooseberry Island, which the Town of

Mashpee Zoning Board of Appeals ("ZBA") had previously rejected due to the lack of vehicular

access between Gooseberry Island and the Mashpee mainland. Pre-filed Direct Testimony of

Thomas J. Bunker, PLS ("Mr. Bunker's PFT"), ¶ 12.

 The Department's SOC affirmed the Town of Mashpee Conservation Commission's

("MCC") earlier denial of the original proposed Project after determining that the Project failed

to satisfy the Performance Standards for activities in Salt Marsh as set forth in the Wetlands

Regulations at 310 CMR 10.32(3) and 10.32(4).[1] SOC, at p. 2. The Department determined that

the original proposed Project failed to satisfy the Performance Standards for Salt Marsh for the

following reasons. <u>Id</u>.

 310 CMR 10.32(3) provides in relevant part that "[a] proposed project in a salt marsh, on

lands within 100 feet of a salt marsh, or in a body of water adjacent to a salt marsh shall not

destroy any portion of the salt marsh and shall not have an adverse effect on the productivity of

the salt marsh." The Department determined that "[t]he [original] proposed project would

destroy salt marsh and would have an adverse effect on the productivity of the salt marsh"

---

[1] The Wetlands Regulations at 310 CMR 10.32(2) define "Salt Marsh" as:

> a coastal wetland that extends landward up to the highest high tide line, that is, the highest spring tide of the year, and is characterized by plants that are well adapted to or prefer living in, saline soils. Dominant plants within salt marshes typically include salt meadow cord grass (*Spartina patens*) and/or salt marsh cord grass (*Spartina alterniflora*), but may also include, without limitation, spike grass (*Distichlis spicata*), high-tide bush (*Iva frutescens*), black grass (*Juncus gerardii*), and common reedgrass (*Phragmites*). A salt marsh may contain tidal creeks, ditches and pools.

Under the Regulations, "Salt marshes are significant to protection of marine fisheries, wildlife habitat, and where there are shellfish, to protection of land containing shellfish, and prevention of pollution and are likely to be significant to storm damage prevention and ground water supply." 310 CMR 10.32(1). As such, no work or activities may be authorized in Salt Marsh unless they satisfy the applicable "Performance Standards" in 310 CMR 10.32(3)-10.32(6). "Performance Standards" are "th[e] requirements established by [the Wetlands Regulations] for activities in or affecting [specific wetlands areas protected by MWPA]." 310 CMR 10.04. The Performance Standards appear at 310 CMR 10.25 through 10.35 and 10.37, and 310 CMR 10.54 through 10.60. <u>Id</u>.

because: (1) "the installation of [sixteen] 14-inch diameter piles within the salt marsh would result in the physical destruction of 17.1 square feet of salt marsh" and (2) "the shading impacts of 990 square feet of bridge decking would have an adverse effect on the productivity of the salt marsh by retarding growth and altering the distribution and composition of the underlying vegetation." SOC, at p. 2.

310 CMR 10.32(4) provides that "[n]otwithstanding the provisions of 310 CMR 10.32(3), a small project within a salt marsh, such as an elevated walkway or other structure which has no adverse effects other than blocking sunlight from the underlying vegetation for a portion of each day, may be permitted if such a project complies with all other applicable requirements of [the Wetlands Regulations at] 310 CMR 10.21 through 10.37." The Department determined that the Petitioners' proposed timber bridge was not a "small project" pursuant to 310 CMR 10.32(4) because "[the proposed] structure [would be] 11 feet wide by 200 feet long and utilize[e] [thirty-nine] 14-inch diameter piles to support the structure." SOC, at p. 2. The Department also determined that "[d]ue to its east-west orientation and size, the large bridge [would] block at least 50% of the sunlight from the underlying vegetation for the majority of, if not the entire day." Id.

The Petitioners initially claimed that the Department's SOC denying the original proposed Project was improper, but shortly after filing this appeal, they waived their challenge to the SOC by withdrawing their original proposed Project plan and submitting a revised proposed Project Plan ("Revised Project Plan") to the Department proposing to construct a steel bridge instead of a timber bridge. The Department supports the Petitioners' Revised Project Plan and requests that the Plan be reviewed and approved in this appeal pursuant to the Department's Plan Change Policy, as set forth in Wetlands Program Policy 91-1: Plan Changes, because the

Petitioners' proposed steel bridge alternative purportedly is not substantially different from their

originally proposed timber bridge and reduces wetlands impacts and satisfies the Performance

Standards for work in Salt Marsh at 310 CMR 10.32, Land Containing Shellfish at 310 CMR

10.34,[2] and Coastal Beach/Tidal Flat at 310 CMR 10.27(3) and 10.27(6).[3] See below, at pp. 28-

50. However, the MCC and two groups of Intervenors opposed to the proposed Project[4] contend

that the Petitioners' Revised Project Plan cannot be reviewed and approved in this appeal for

---

[2] Under 310 CMR 10.34(2), "Land Containing Shellfish means . . . salt marshes . . . when [they] . . . contain[n] shellfish." Shellfish are defined as including the following species: Bay scallop (Argopecten irradians); Blue mussel (Mytilus edulis); Ocean quahog (Arctica islandica); Oyster (Crassostrea virginica); Quahog (Mercenaria merceneria); Razor clam (Ensis directus); Sea clam (Spisula solidissima); Sea scallop (Placopecten magellanicus); and Soft shell clam (Mya arenaria). 310 CMR 10.34(2).

[3] Under 310 CMR 10.27(2):

> Coastal Beach [is] unconsolidated sediment subject to wave, tidal and coastal storm action which forms the gently sloping shore of a body of salt water and includes tidal flats. Coastal beaches extend from the mean low water line landward to the dune line, coastal bankline or the seaward edge of existing human-made structures, when these structures replace one of the above lines, whichever is closest to the ocean.

A Tidal Flat is defined as "any nearly level part of a coastal beach which usually extends from the mean low water line landward to the more steeply sloping face of the coastal beach or which may be separated from the beach by land under the ocean." 310 CMR 10.27(2).

[4] The Intervenors are:

(1)     the members of the Wolpe, Atkins, and Weltman Group consisting of Robert A. Wolpe, Michelle A. Wolpe, James C. Atkins, Jr., and John J. Weltman, who contend that they own a portion of the land on which the Petitioners seek to build the bridge and where Salt Marsh is located; and

(2)     the members of Mashpee Wampanoag Tribe Group consisting of the Mashpee Wampanoag Tribe, a federally recognized Indian tribe, and 12 of its Tribal Members, who contend that since 1977 the Tribe has held a Shellfish Grant License from the Town of Mashpee and approved by the Commonwealth that authorizes the Tribe to grow shellfish in the area where the Petitioners seek to build the bridge and that the bridge's construction will result in significant environmental impacts to the shellfish beds in the area and the permanent loss of shellfish habitat.

Wolpe, Atkins, and Weltman Group's Motion to Intervene (August 18, 2015); Mashpee Wampanoag Tribe Group's Motion to Intervene (August 18, 2015). The Mashpee Wampanoag Tribe and the members of Wolpe, Atkins, and Weltman Group previously actively opposed the original proposed Project while the Project was undergoing SOC review by the Department. See March 6, 2015 Letter to Department by Mark C. Tilden, legal counsel to Mashpee Wampanoag Tribe; March 2, 2015 Letter to Department by Brian M. Hurley, legal counsel to Robert Wolpe and John Weltman.

following reasons.

First, the MCC and the Intervenors contend that the Petitioners' appeal of the SOC was

barred at the outset of appeal's filing because the MCC rejected the original proposed Project

both pursuant to the MWPA and the Town of Mashpee's Wetlands Protection Bylaw and the

Petitioners did not appeal the local Bylaw denial to Superior Court.[5] See below, at pp. 17-28.  In

the alternative, the MCC and the Intervenors contend that if the Petitioners' appeal of the SOC

was not barred, the Petitioners' Revised Project Plan cannot be reviewed and approved in this

appeal pursuant to the Department's Plan Change Policy because the Petitioners' proposed steel

bridge alternative is substantially different from the originally proposed timber bridge, thus

requiring the Petitioners to file a new NOI with the MCC seeking approval for construction of

the steel bridge.  See below, at pp. 28-50.  They also contend that the Petitioners' construction of

the steel bridge will increase, not decrease, impacts to Salt Marsh and Land Containing Shellfish.

Id.

I conducted a one day evidentiary Adjudicatory Hearing to resolve the following issues

raised by the parties' claims concerning the Petitioners' Revised Project Plan:

> **1.**     Whether the Petitioners' appeal of the SOC was barred at the
> time of the appeal's filing because they did not appeal to Superior Court

---

[5] In issuing its SOC, the Department only affirmed that aspect of the MCC's denial of the original proposed Project
under the MWPA and the Wetlands Regulations because the Department lacks jurisdiction to review decisions of
local conservation commissions under local Wetlands Protection Bylaws and Regulations.  Oyster Creek
Preservation, Inc. v. Conservation Commission of Harwich, 449 Mass. 859, 866-67 (2007); Healer v. Department of
Environmental Protection, 73 Mass. App. 714, 716 (2009); In the Matter of John Walsh and Walsh Brothers
Building Co., Inc., Memorandum and Order Denying Petitioners' and Harwich Conservation Commission's Joint
Motion to Proceed (September 10, 2013), 2013 MA ENV LEXIS 92, at 10; Order Granting Petitioners' Renewed
Motion to Proceed (September 18, 2014); Recommended Remand Decision (April 23, 2015), 2015 MA ENV
LEXIS 35; Decision Adopting  Recommended Remand Decision (June 2, 2015), 2015 MA ENV LEXIS 34.

the MCC's denial of the original proposed Project under the Mashpee Wetlands Protection Bylaw?[6]

    **a.**    Did the MCC issue its Order of Conditions denying the Petitioners' original proposed Project within 21 days after closing its public hearing on the Petitioners' original proposed Project in accordance with the MWPA and 310 CMR 10.05(6)(a)?

        **(1)**    Did the MCC's public hearing close on January 8, 2015 as the Petitioners assert or January 22, 2015 as the MCC asserts?

**2.**    If the Petitioners' appeal of the SOC was not barred at the outset of the appeal's filing, does the Petitioners' revised Project Plan have plan changes that are substantially different from the original proposed Project plan requiring the filing of a new NOI with the MCC?

    **a.**    Do the plan changes significantly modify the project configuration?

    **b.**    If so, do the plan changes result in increased impacts to wetlands resource areas?

At the Adjudicatory Hearing, the parties and the Intervenors were represented by legal counsel and presented witnesses and documentary evidence in support of their respective positions in the case. A total of eight witnesses, including six expert witnesses, testified and each witness was cross-examined under oath on the sworn Pre-filed Testimony ("PFT") that the witness had filed prior to the Adjudicatory Hearing in support of the parties' respective positions in the case. The Adjudicatory Hearing was stenographically recorded by a certified Court reporter retained by the Petitioners and/or Intervenors at their expense, and the subsequent Hearing Transcript was made available to the parties following the Hearing, which assisted them

---

[6] The parties agreed that this was the threshold issue in this appeal because if the appeal was barred at the time of its filing, the second issue above regarding whether the Petitioners' Revised Project Plan could be reviewed and approved in this appeal pursuant to the Department's Plan Change Policy, would be moot.

in preparing their respective Closing Briefs in the case.

At the Adjudicatory Hearing, three witnesses testified on behalf of the Petitioners:

(1)   Thomas Bunker ("Mr. Bunker"), a Professional Land Surveyor and a principal of BSS Design, Inc., a land surveying and civil engineering firm in Falmouth, Massachusetts;

(2)   Joseph M. Forns ("Mr. Forns"), a Senior Environmental Scientist and principal of Applied Marine Ecological Lab, an environmental consulting firm in Falmouth, Massachusetts; and

(3)   Matthew Haney, the Trustee of the Petitioner Gooseberry Island Trust and Trustee of the Petitioner SN Trust ("Mr. Haney").

One witness testified on behalf of the MCC: its Conservation Agent, Andrew R.

McManus ("Mr. McManus").

One witness testified on behalf of the Intervenor Wolpe, Atkins, and Weltman Group:

Robert F. Daylor ("Mr. Daylor"), who is a Professional Engineer, a Professional Land Surveyor,

and a Senior Vice President of Tetra Tech, Inc., a national engineering consulting firm with

offices in Marlborough, Massachusetts.

Two witnesses testified on behalf of the Intervenor Mashpee Wampanoag Tribe Group:

(1)   Amy M. Ball ("Ms. Ball"), a Project Manager and Senior Ecologist at the Horsley Witten Group, Inc., an environmental consulting firm in Sandwich, Massachusetts; and

(2)   George "Chuckie" Green ("Mr. Green"), the Assistant Director of Natural Resources for the Mashpee Wampanoag Tribe.

Lastly, one witness testified on behalf of the Department: Mark N. Bartow, an

Environmental Analyst in the Wetlands Program in the Department's Southeast Regional Office

who conducted the SOC review on behalf of the Department.

As discussed below, based on the testimonial and documentary evidence of the parties'

respective witnesses at the Adjudicatory Hearing, I find that:

(1)     the Petitioners' appeal of the SOC was not barred at the time of the appeal's filing because in contravention to the MWPA and 310 CMR 10.05(6)(a), the MCC issued its Order of Conditions denying the original proposed Project more than 21 days after closing its public hearing on the Petitioners' NOI for the proposed Project, and, as such, the Petitioners were not required to appeal to Superior Court the MCC's rejection of the original proposed Project under the Mashpee Wetlands Protection Bylaw; and

(2)     the Petitioners' Revised Project Plan cannot be reviewed and approved in this appeal pursuant to the Department's Plan Change Policy, because the Petitioners' proposed steel bridge alternative is substantially different from their originally proposed timber bridge and will increase impacts to Salt Marsh and Land Containing Shellfish.

Accordingly, I recommend that the Department's Commissioner issue a Final Decision:

(1) affirming the Department's SOC denying the Petitioners' original proposed Project because the Petitioners waived any objections to the SOC by submitting a Revised Project Plan to the Department in this appeal; and (2) denying review and approval of the Petitioners' Revised Project Plan pursuant to the Department's Plan Change Policy because the Petitioners' proposed steel bridge alternative is substantially different from their originally proposed timber bridge and increases wetlands impacts to Salt Marsh and Land Containing Shellfish.

## **BACKGROUND**

The Petitioners own Gooseberry Island, a 3.5+/- acre island located in the northern part of Popponesset Bay in Mashpee approximately 200 feet offshore from the end of Punkhorn Point Road in Mashpee. Mr. Bunker's PFT, ¶ 9. Gooseberry Island is comprised of approximately two acres of forested upland and approximately 1.5+/- acres of Salt Marsh. Id.

Gooseberry Island is separated from the Mashpee Mainland by a small channel that is

approximately 40 feet wide at mean low water, and 80 feet wide at mean high water. Id., ¶ 10.

The 200 feet offshore area separating Gooseberry Island and Punkhorn Point Road on the

Mashpee Mainland consists of Salt Marsh. Id. The maximum water depth is less than two feet

at mean low water, and the substrate in the channel consists of unconsolidated muck and silt.

Id.

The Intervenor Mashpee Wampanoag Tribe possesses a Private Shellfish Grant that it

received from the Town of Mashpee in 1977 pursuant to G.L. c. 130, §§ 57 – 68A. Pre-filed

Direct Expert Testimony of Amy M. Ball ("Ms. Ball's PFT"), ¶ 9; Exhibit 6 to Ms. Ball's PFT;

Pre-filed Direct Testimony of George "Chuckie" Green ("Mr. Green's PFT"), ¶¶ 1-4. The

Tribe's Shellfish Grant is valid through 2027 and occupies the entirety of the tidal creek between

the Mashpee mainland at Punkhorn Point Road and Gooseberry Island and nearly encircles the

Island. Ms. Ball's PFT, ¶ 9. According to the Commonwealth's Division of Marine Fisheries

("DMF"),[7] the Tribe "currently grow[s] out American oysters [at the site], but would like the

opportunity to grow out other shellfish species as well." Exhibit 6 to Ms. Ball's PFT. "Quahogs

[have been] stocked on the south side of [Gooseberry] [I]sland while soft shell clam seed [has

been] planted on the north side of the island." Id. "[The Tribe's] members partake in

Sustenance Harvest of ribbed mussels, softshell clams, and quahogs annually." Mr. Green's

PFT, ¶ 8.

Prior to seeking approval from the MCC for construction of their originally proposed

timber bridge, the Petitioners sought approval from the Mashpee ZBA to construct a single-

family home on Gooseberry Island without a means of vehicular access between the Island and

---

[7] DMF "is responsible for the conservation of marine fisheries resources[,] includ[ing] managing both recreational
and commercial harvesting of saltwater finfish, shellfish, and crustaceans like lobster and
crab." http://www.mass.gov/eea/agencies/dfg/about.

the Mashpee Mainland, including for public safety and other emergency vehicles. Mr. Bunker's

PFT, ¶ 12. The lack of such vehicular access caused the Mashpee ZBA in October 2013 to deny

the Petitioners' proposed construction of the single-family home. Id. As a result, the Petitioners

sought the MCC's approval under the MWPA, the Wetlands Regulations, and the Mashpee

Wetlands Protection By-law to construct the timber bridge to provide vehicular access between

Gooseberry Island and the Mashpee Mainland. Id. As discussed above, both the MCC and the

Department rejected the Petitioners' proposed construction of the timber bridge pursuant to the

MWPA and the Wetlands Regulations, and the MCC also rejected the Project pursuant to the

Mashpee Wetlands Protection By-law. The Petitioners then presented their steel bridge

alternative to the Department through the Revised Project Plan during the pendency of this

appeal of the Department's SOC.

## STATUTORY AND REGULATORY FRAMEWORK

The purpose of the MWPA and the Wetlands Regulations is to protect wetlands and to

regulate activities affecting wetlands areas in a manner that promotes the following eight

statutory interests:

> (1) protection of public and private water supply;
>
> (2) protection of ground water supply;
>
> (3) flood control;
>
> (4) storm damage prevention;
>
> (5) prevention of pollution;
>
> (6) protection of land containing shellfish;
>
> (7) protection of fisheries; and
>
> (8) protection of wildlife habitat.

G.L. c. 131, § 40; 310 CMR 10.01(2); In the Matter of Gary Vecchione, OADR Docket No.

WET-2014-008, Recommended Final Decision (August 28, 2014), 2014 MA ENV LEXIS 76, at

6-7, adopted as Final Decision (September 23, 2014), 2014 MA ENV LEXIS 77; In the Matter of

Webster Ventures, LLC, OADR Docket No. WET-2014-016, Recommended Final Decision

(February 27, 2015), 2015 MA ENV LEXIS 14, at 10-11, adopted as Final Decision (March 26,

2015), 2015 MA ENV LEXIS 10; In the Matter of Elite Home Builders, LLC, OADR Docket

No. WET-2015-010, Recommended Final Decision (November 25, 2015), adopted as Final

Decision (December 17, 2015), 22 DEPR 202, 204 (2015); In the Matter of Sunset City, Inc.,

OADR Docket No. WET-2016-016, Recommended Final Decision (March 31, 2017), 2017 MA

ENV LEXIS 35, at 9-10, adopted as Final Decision (April 21, 2017, 2017 MA ENV LEXIS 33.

The MWPA and the Wetlands Regulations provide that "[n]o person shall remove, fill,

dredge[,] or alter[8] any [wetlands] area subject to protection under [the MWPA and Wetlands

Regulations] without the required authorization, or cause, suffer or allow such activity . . . ."

G.L. c. 131 § 40, ¶ 32; 310 CMR 10.02(2)(a); Vecchione, 2014 MA ENV LEXIS 76, at 7;

Webster Ventures, 2015 MA ENV LEXIS 14, at 11-12; Elite Home Builders, 22 DEPR at 204;

---

[8] The Wetlands Regulations at 310 CMR 10.04 define "alter" as "chang[ing] the condition" of any wetlands area subject to protection under the MWPA and the Wetlands Regulations.  Examples of alterations include, but are not limited to, the following:

    (a) the changing of pre-existing drainage characteristics, flushing characteristics, salinity distribution, sedimentation patterns, flow patterns and flood retention areas;

    (b) the lowering of the water level or water table;

    (c) the destruction of vegetation;

    (d) the changing of water temperature, biochemical oxygen demand (BOD), and other physical, biological or chemical characteristics of the receiving water.

310 CMR 10.04.  "Dredge" is defined as "deepen[ing], widen[ing], or excavat[ing], either temporarily or permanently" a protected wetlands area, and "[f]ill means to deposit any material [in a protected wetlands area] so as to raise an elevation, either temporarily or permanently." Id.

Sunset City, 2017 MA ENV LEXIS 35, at 10. "Any activity proposed or undertaken within [a protected wetlands] area[,] . . . which will remove, dredge or alter that area, is subject to Regulation under [the MWPA and the Wetlands Regulations] and requires the filing of a Notice of Intent ("NOI")" with the permit issuing authority. 310 CMR 10.02(2)(a). A party must also file an NOI for "[a]ny activity . . . proposed or undertaken within 100 feet of [any protected wetlands]" described as "the Buffer Zone" by the Regulations, "which, in the judgment of the [permit] issuing authority, will alter [any protected wetlands]." 310 CMR 10.02(2)(b).

The "[permit] issuing authority" is either the local Conservation Commission when initially reviewing the applicant's proposed work in a wetlands resource area protected by the MWPA and the Wetlands Regulations, or the Department when it assumes primary review of the proposed work or review on appeal from a local Conservation Commission decision. Healer, 73 Mass. App. Ct. at 717-19. Under the MWPA, a local Conservation Commission may issue an Order of Conditions authorizing or precluding proposed construction activities in protected wetlands areas and "[is] allowed to 'impose such conditions as will contribute to the protection of the interests described [in MWPA and the Wetlands Regulations]'" and to require that "'all work shall be done in accordance' with the conditions they might impose. . . ." Id.

Orders of Condition, including any findings and wetlands delineations forming the basis of the Orders, are valid for three years from the date of the Orders' issuance. 310 CMR 10.05(6)(d). However, any "order [by the Department] shall supersede the prior order of the conservation commission [issued pursuant to the MWPA and the Wetlands Regulations]. . . and all work shall be done in accordance with the [Department's] order," Id., unless the Commission has properly denied the proposed project pursuant to a local Wetlands Protection Bylaw that is more protective than the MWPA. Oyster Creek, 449 Mass. at 866. This is the case because the

MWPA "establishes Statewide minimum wetlands protection standards, [but] local communities are free to impose more stringent requirements" by enacting local Wetlands Protection Bylaws. Oyster Creek, 449 Mass. at 866; Healer, 73 Mass. App. At 716.  As a result, an SOC issued by the Department under the MWPA approving proposed work in protected wetlands areas cannot preempt a timely decision of a local conservation commission denying approval of the proposed work based "on provisions of a local bylaw that are more protective than the [MWPA]."  Oyster Creek, 449 Mass. at 866.  This deference to local regulation is supported by General Condition No. 3 that appears in every SOC issued by the Department.  Walsh, 2013 MA ENV LEXIS 92, at 10.

General Condition No. 3 provides that the SOC "does not relieve the [applicant] . . . of **the necessity** of complying with all other applicable, federal, state, or **local statutes, ordinances, bylaws, or regulations.**"  (emphasis supplied).  Hence, if a project is denied under a local Wetlands Protection Bylaw, and "[the] denial . . . become[s] final . . . either because it is not appealed [to Superior Court][9] or because on appeal the denial is affirmed [by the Court], there remains no doubt that . . . [t]his forecloses [the applicant's ability to comply] with wetlands General Condition [No.] 3 and, . . . therefore, . . . the project cannot [proceed]."  Walsh, 2013 MA ENV LEXIS 92, at 11-12, citing, In the Matter of Howard Fafard, Docket Nos. 96-040, 96-044, Final Decision (December 4, 1996), 1996 MA ENV LEXIS 122 at 6.  In sum, "[a] final local wetlands bylaw denial thus makes . . . further project review under the [MWPA] and [the

---

[9] Decisions of local conservation commissions approving or rejecting proposed activities in protected wetlands areas pursuant to local wetlands protection bylaws are generally appealable to the Superior Court pursuant to the Certiorari Statute, G.L. c. 249, § 4.  The statute provides in relevant part that:

> [a] civil action in the nature of certiorari to correct errors in proceedings which are not according to the course of the common law, which proceedings are not otherwise reviewable by motion or by appeal, may be brought in the supreme judicial or superior court[,] [and that] . . . [s]uch  action shall be commenced within sixty days next after the proceeding complained of.

Wetlands] Regulations, [a] . . . futile academic exercise[e]," and as result, an administrative appeal challenging an SOC authorizing the project should be dismissed as moot in accordance with 310 CMR 1.01(5)(a)2.[10] Walsh, 2013 MA ENV LEXIS 92, at 11-12, citing, Fafard, at 7. "[The SOC] must [also] be vacated in the final decision dismissing the appeal as moot, since the final local wetlands bylaw denial establishes that the project [cannot] be built as conditioned and [cannot] comply with General Condition 3 if it were built." Id.

However, a local Conservation Commission's right to deny a proposed project pursuant to a local Wetlands Protection Bylaw that is more protective than the MWPA will be lost if the Commission's decision denying the proposed project is untimely. Oyster Creek, 449 Mass. at 862-63. As discussed above, any person seeking to perform work within a wetlands area protected by the MWPA and the Wetlands Regulations must file an NOI with the local Conservation Commission seeking approval of the proposed work. 310 CMR 10.02(2)(a) and 10.02(2)(b). The MWPA and the Wetlands Regulations require "the conservation commission [to] hold a public hearing on the proposed project within twenty-one days after receiving the [NOI]." Oyster Creek, 449 Mass. at 862-63. "The [MWPA] further prescribes that the conservation commission 'shall . . . within twenty-one days of such hearing' issue a written order that imposes conditions on the proposed work to be done (including denial of the project), or that determines no conditions are necessary." Id., at 863. This 21 day time limitation is also set forth in the Wetlands Regulations at 310 CMR 10.05(6)(a). As the SJC held in Oyster Creek, the failure of a local Conservation Commission to abide by this 21 day deadline will have negative

---

[10] 310 CMR 1.01(5)(a)2 provides in relevant part that "[t]he Presiding Officer may, on the Presiding Officer's own initiative or on a party's motion where appropriate . . . dismiss appeals for . . . mootness, . . . or where the record discloses that the proposed project [or] activity has been denied by a local, state or federal agency or authority pursuant to law other than that relied on by the Department in the decision appealed from, and such denial has become final").

consequences on the Commission's attempt to deny a proposed project under a local Wetlands

Protection Bylaw.  Under these circumstances, the Commission's denial under a local Bylaw

does not override the Department's SOC approving or denying a proposed project.  449 Mass. at

866.  In the SJC's words: "where a conservation commission issues its [Order] after the [21 day]

statutory deadline, . . . [the commission] lose[s] the right to insist on the provisions of its local

bylaw, and . . . any superseding order issued by the [Department] . . . appl[ies] in its stead."  Id.

**FINDINGS**

## I.    THE PETITIONERS' BURDEN OF PROOF AT THE HEARING

As I explained to the parties at the Pre-Hearing Conference that I conducted with them

several months prior to the Adjudicatory Hearing, the Petitioners had the burden of proving by a

preponderance of the evidence at the Hearing that: (1) their appeal of the SOC was not barred at

the time of the appeal's filing; and (2) their Revised Project Plan could be reviewed and

approved in this appeal pursuant to the Department's Plan Change Policy.  310 CMR 10.03(2),

10.05(7)(j)2.b.iv, 10.05(7)(j)2.b.v, 10.05(7)(j)3.a, 10.04, 10.05(7)(j)3.b; In the Matter of Jodi

Dupras, OADR Docket No. WET-2012-026, Recommended Final Decision (July 3, 2013), 2013

MA ENV LEXIS 40, at 10-13, adopted as Final Decision (July 12, 2013), 2013 MA ENV LEXIS

61; Vecchione, 2014 MA ENV LEXIS 76, at 10; Webster Ventures, 2015 MA ENV LEXIS 14,

at 33-34; Elite Home Builders, 22 DEPR at 205; Sunset City, 2017 MA ENV LEXIS 35, at 15-

16.

Specifically, the Petitioners were required to present "credible evidence from a competent

source in support of . . . [their claims], including any relevant expert report(s), plan(s), or

photograph(s)."  310 CMR 10.05(7)(j)3.c; Dupras, 2013 MA ENV LEXIS 40, at 11; Vecchione,

supra, 2014 MA ENV LEXIS 76, at 10; Webster Ventures, 2015 MA ENV LEXIS 14, at 34;

Elite Home Builders, 22 DEPR at 205; Sunset City, 2017 MA ENV LEXIS 35, at 16. "A 'competent source' is a witness who has sufficient expertise to render testimony on the technical issues on appeal." In the Matter of City of Pittsfield Airport Commission, OADR Docket No. 2010-041, Recommended Final Decision (August 11, 2010), 2010 MA ENV LEXIS 89, at 36-37, adopted as Final Decision (August 19, 2010), 2010 MA ENV LEXIS 31; Dupras, 2013 MA ENV LEXIS 40, at 11-12; Vecchione, 2014 MA ENV LEXIS 76, at 10; Webster Ventures, 2015 MA ENV LEXIS 14, at 34-35; Elite Home Builders, 22 DEPR at 205; Sunset City, supra, 2017 MA ENV LEXIS 35, at 16. Whether the witness has such expertise depends "[on] whether the witness has sufficient education, training, experience and familiarity with the subject matter of the testimony." Commonwealth v. Cheromcka, 66 Mass. App. Ct. 771, 786 (2006) (internal quotations omitted); see e.g. Pittsfield Airport Commission, supra, 2010 MA ENV LEXIS 89, at 36-39 (petitioner's failure to submit expert testimony in appeal challenging MassDEP Commissioner's issuance of 401 Water Quality Certification Variance to Pittsfield Airport Commission fatal to petitioner's claims because Variance was "detailed and technical . . . requiring expert testimony on issues . . . implicated by the Variance," including . . . (1) wetland replication, restoration, and enhancement, (2) mitigation of environmental impacts to streams, and (3) stormwater discharge and treatment[,] [and (4)] . . . runway safety and design"); Dupras, 2013 MA ENV LEXIS 40, at 36-37 (petitioner not qualified to interpret technical data involving Shellfish Suitability Areas); Vecchione, 2014 MA ENV LEXIS 76, at 26 (petitioner not qualified to testify as to impacts on wetlands resources areas due to his lack of expertise in wetlands protection).

As for the relevancy, admissibility, and weight of evidence that the parties sought to

introduce at the Adjudicatory Hearing, these issues were governed by G.L. c. 30A, § 11(2) and

310 CMR 1.01(8)(a).  Under G.L. c. 30A, § 11(2):

> [u]nless otherwise provided by any law, agencies need not observe the rules of
> evidence observed by courts, but shall observe the rules of privilege recognized
> by law.  Evidence may be admitted and given probative effect only if it is the kind
> of evidence on which reasonable persons are accustomed to rely in the conduct of
> serious affairs.  Agencies may exclude unduly repetitious evidence, whether
> offered on direct examination or cross-examination of witnesses.

Under 310 CMR 1.01(8)(a), "[t]he weight to be attached to any evidence . . . rest[ed] within the

discretion of the Presiding Officer. . . ."

As discussed below, the Petitioners met their burden of proving that their appeal of the

SOC was not barred at the time of the appeal's filing as a result of not having appealed to

Superior Court the MCC's denial of the original proposed Project under the Mashpee Wetlands

Protection By-law.  See below, at pp. 17-28.  However, the Petitioners failed to meet their

burden of proving that their Revised Project Plan could be reviewed and approved in this appeal

pursuant to the Department's Plan Change Policy.  See below, at pp. 28-50.

## II.    THE PETITIONERS' APPEAL OF THE SOC WAS NOT BARRED AT THE TIME OF THE APPEAL'S FILING

The MWPA provides that:

> *[t]he conservation commission . . . shall hold a public hearing on the proposed
> activity within twenty-one days of the receipt of [the NOI]. . . .* If after said
> hearing the conservation commission . . . determine[s] that the area on which the
> proposed work is to be done is significant to public or private water supply, to the
> groundwater supply, to flood control, to storm damage prevention, to prevention
> of pollution, to protection of land containing shellfish, to the protection of wildlife
> habitat or to the protection of fisheries or to the protection of the riverfront area
> consistent with the following purposes: to protect the private or public water
> supply; to protect the ground water; to provide flood control; to prevent storm
> damage; to prevent pollution; to protect land containing shellfish; to protect
> wildlife habitat; and to protect the fisheries, *[the] conservation commission . . .
> shall by written order within twenty-one days of such hearing impose such*

> *conditions as will contribute to the protection of the interests described herein,*
> *and all work shall be done in accordance therewith. . . .*

G.L. c. 131, § 40 (emphasis supplied).  The MWPA also provides that:

> *[i]f a conservation commission has failed to hold a hearing within the twenty-*
> *one day period as required,* or if a commission, after holding such a hearing has
> failed within twenty-one days therefrom to issue an order, . . . *the applicant,* any
> person aggrieved by said commission's order or failure to act, or any owner of
> land abutting the land upon which the proposed work is to be done, or any ten
> residents of the city or town in which said land is located, *may, by certified mail*
> *and within ten days from said commission's order or failure to act, request [an*
> *SOC from the Department] . . . .*

Id. (emphasis supplied).

The Wetlands Regulations at 310 CMR 10.05(a) repeat the MWPA's requirement that

"[a] public hearing shall be held by the conservation commission [on an NOI] within 21 days of

[its] receipt of the [NOI] . . . ."  Under 310 CMR 10.05(b), "[p]ublic hearings [on an NOI] may

be continued [only] as follows":

1.    without the consent of the applicant to a date, announced at the hearing,
      within 21days, of receipt of [an NOI];

2.    with the consent of the applicant, to an agreed-upon date, which
      shall be announced at the hearing; or

3.    with the consent of the applicant for a period not to exceed 21 days
      after the submission of a specified piece of information or the occurrence
      of a specified action. The date, time and place of [the] continued hearing
      shall be publicized in accordance with [the MWPA], and notice shall be
      sent to any person at the hearing who so requests in writing.

The provisions of 310 CMR 10.05(6)(a) make clear that "[w]ithin 21 days of the close of [its]

public hearing [on an NOI], the conservation commission shall either":

1.    make a determination that the area on which the work is proposed to be
      done . . . is not significant to any of the [MWPA] interests [set forth
      above] . . .; or

2.    make a determination that the area on which the work is proposed to be

done . . . is significant to one or more of the [MWPA] interests [set forth above], and shall issue an Order of Conditions for the protection of said interests . . . .

Here, it is undisputed that the MCC issued its Order of Conditions denying the original proposed Project on February 11, 2015 and that the Petitioners did not appeal to Superior Court the MCC's denial under the Mashpee Wetlands Protection Bylaw. It is the Petitioners' and the Department's position that the Petitioners did not have to appeal to Superior Court the MCC's denial under Mashpee Wetlands Protection Bylaw because the MCC issued its Order of Conditions more than 21 days after closing its public hearing on the Petitioners' NOI for the original proposed Project. The MCC and the Intervenors, however, take the opposite view, contending that the MCC issued its Order of Conditions within the required 21 day period, and, as such, the Petitioners' appeal of the SOC was barred at the time of the appeal's filing because the Petitioners did not appeal to Superior Court the MCC's denial under Mashpee Wetlands Protection Bylaw. Based on the MWPA and the Wetlands Regulations and a strong preponderance of the evidence introduced at the Adjudicatory Hearing, I find that the Petitioners' appeal of the SOC was not barred at the time of the appeal's filing because the MCC issued its Order of Conditions beyond the required 21 day period, and, as a result, the Petitioners were not required to appeal to Superior Court the MCC's local bylaw denial of the original proposed Project.

The MCC and the Intervenors contend that the MCC closed its public hearing on the Petitioners' NOI for the original proposed Project on January 22, 2015, making February 12, 2015 as the 21 day deadline date under the MWPA and 310 CMR 10.05(6)(a) for the MCC to issue its Order of Conditions, and that the MCC met the deadline by issuing its Order of denial on February 11, 2015. The evidence introduced at the Hearing, however, demonstrates that the

MCC closed its public hearing on the Petitioners' NOI for the original proposed Project on January 8, 2015, making January 29, 2015 as the 21 day deadline date for the MCC's issuance of its Order of Conditions on the NOI.

This evidence includes a transcript of the MCC's January 8, 2015 public hearing on the Petitioners' NOI for the original proposed Project, which demonstrates that the MCC closed its public hearing on the Petitioners' NOI on that date, and not on January 22, 2015, as the MCC and the Intervenors contend.[11]  The transcript shows that the MCC closed its public hearing on January 8, 2015 after the Petitioners' counsel, the MCC's members, and the MCC's Conservation Agent, Mr. McManus, had the following extended discussion regarding whether the MCC should close the public hearing on that date:

> **MR. MCMANUS TO THE MCC:**     The way I see it, you have two choices before you: [1] You can continue the issue to read into the materials which have been gone over verbally before you tonight, or [2] you can render a decision whether you believe the project meets the [wetlands] performance standards. . . .[12]
>
> **THE PETITIONERS' COUNSEL[13] TO THE MCC:**     There's a third option that Mr. McManus didn't mention, which is that if you do feel that you have enough information, you could close tonight, but not make a decision, because you have twenty-one days from the day of the close of the hearing to make a decision.[14]

---

[11] A copy of the MCC's Hearing Transcript of January 8, 2015 is attached as Exhibit 1 to the PFT of the Petitioners' witness, Mr. Haney.  The Transcript is cited above in the text as "MCC's Jan. 8, 2015 Transcript."

[12] MCC's Jan. 8, 2015 Transcript, at p. 5, lines 18-23 (bracketed numbers supplied).

[13] The Petitioners' counsel in the MCC's Jan. 8, 2015 Transcript is designated by name "Unidentified."

[14] MCC's Jan. 8, 2015 Transcript, at p. 9, lines 7-13.

**MR. McMANUS TO THE MCC:**     Yes.[15]

**THE PETITIONERS' COUNSEL TO THE MCC:**     So, a third option is to Close [the hearing], but read everything and deliberate at your subsequent meeting.[16] . . .

**MCC MEMBER TO THE PETITIIONERS' COUNSEL:**     What's the advantage to that?[17]

**THE MCC CHAIRMAN TO THE PETITIONERS' COUNSEL:**     Yeah, what's the advantage of that?[18]

**THE PETITIONERS' COUNSEL TO THE MCC:**     The advantage to that, as I see it, is, it ends this process of back-and-forth.  In other words, you wouldn't be sitting in this same situation two weeks from now when additional information has been submitted by us, responded to by three other consultants, and now you're back in the same situation.  It would cut off the discussion at this point. But we won't want to do that if you . . . feel that we need to provide additional information.  We want to give you everything you need to render a decision.[19]

**THE MCC CHAIRMAN TO THE PETITIONERS' COUNSEL:**     We want to make the right decision.  We've had some problems with decisions that we've had to rectify.[20]

---

[15] MCC's Jan. 8, 2015 Transcript, at p. 9, line 14.

[16] MCC's Jan. 8, 2015 Transcript, at p. 9, lines 15-17.

[17] MCC's Jan. 8, 2015 Transcript, at p. 9, lines 19-20.

[18] MCC's Jan. 8, 2015 Transcript, at p. 9, lines 21-22.

[19] MCC's Jan. 8, 2015 Transcript, at p. 9, lines 23-24; p. 10, lines 1-10.

[20] MCC's Jan. 8, 2015 Transcript, at p. 10, lines 11-13.

**THE PETITIONERS' COUNSEL TO THE MCC:**        Right, and we appreciate that.[21] . . .

**MCC MEMBER TO MCC CHAIRMAN:**        I feel that we've got the information we need.  I have no further questions.  So, it does strike me that a real good procedure for closing the——for making sure that we're going to be deciding next week is that we just close it.  That sounds good to me.  If that's— that process would work correctly, right?  We could close tonight as he described?[22] . . .

**MCC CHAIRMAN TO MCC MEMBER:**        You want to close it off?[23]

**MCC MEMBER TO MCC CHAIRMAN:**        Close it tonight and have a decision ready by the next meeting.[24] . . .

**MR. MCMANUS TO THE MCC:**        [Y]ou have all the information you need, and if I get what you're saying, and absorb all of this for a decision at the next meeting[.][25] . . .

**MCC CHAIRMAN TO MR. MCMANUS:**        Well, that was supposed to be the design, that tonight we would have all the information we needed to make a decision and we would think about it and make a decision on January 22[, 2015].[26] . . .

---

[21] MCC's Jan. 8, 2015 Transcript, at p. 10, lines 14-15.

[22] MCC's Jan. 8, 2015 Transcript, at p. 11, lines 2-9.

[23] MCC's Jan. 8, 2015 Transcript, at p. 11, lines 10-11.

[24] MCC's Jan. 8, 2015 Transcript, at p. 11, lines 12-13.

[25] MCC's Jan. 8, 2015 Transcript, at p. 11, lines 19-22.

[26] MCC's Jan. 8, 2015 Transcript, at p. 11, lines 23-24; p. 12, lines 1-3.

**MR. MCMANUS TO THE MCC:**      I mean, if you want my . . .

recommendation, I think you should close with the statement that you have all the

information you need and there should be no information forthcoming, that you

go over all the information that you have in front of you right now to render a

decision on the [January 22, 2015].[27] . . .

**MCC CHAIRMAN TO MR. MCMANUS:**      You want us to close it, huh,

tonight?[28]

**MR. MCMANUS TO THE MCC:**      I think that you should—if, you know, if

you want to go with my suggestion that you vote to close the hearing and . . .

issue a decision on [January 22, 2015], that would be my suggestion.[29]

**MCC CHAIRMAN TO MCC MEMBERS:**      How do you feel about

that?[30]

**MCC MEMBER No. 1:**      That seems reasonable.[31]

**MCC MEMBER No. 2:**      I agree.[32]

**MCC CHAIRMAN TO MR. MCMANUS:**      I guess you've got—

everybody agrees with you.[33] . . .

**THE PETITIONERS' COUNSEL TO THE MCC:**      [J]ust by a point of

---

[27] MCC's Jan. 8, 2015 Transcript, at p. 12, lines 3-12.

[28] MCC's Jan. 8, 2015 Transcript, at p. 19, lines 3-4.

[29] MCC's Jan. 8, 2015 Transcript, at p. 19, lines 5-9.

[30] MCC's Jan. 8, 2015 Transcript, at p. 19, line 10.

[31] MCC's Jan. 8, 2015 Transcript, at p. 19, lines 11-12.

[32] MCC's Jan. 8, 2015 Transcript, at p. 19, line 13.

[33] MCC's Jan. 8, 2015 Transcript, at p. 19, lines 14-16.

order to make sure—if I understand what the board is going to do is close the hearing-- . . . and then deliberate at your subsequent hearing.[34]

**MCC CHAIRMAN TO MR. MCMANUS**:        Yeah, and we'll come back on [January 22, 2015].[35] . . .

**THE PETITIONERS' COUNSEL TO THE MCC**:        [W]hat the law provides is that the evidentiary phase of the hearing closes and then you have twenty-one days within which to issue your decision.[36]

**MCC MEMBER TO MR. MCMANUS**:    Right, right.[37]

**THE PETITIONERS' COUNSEL TO THE MCC**:        And I think that it would be important for all the parties here to understand clearly that if the hearing is closed, then there's no other submissions by anybody.[38]

**MCC MEMBER TO MR. MCMANUS**:    Yes.[39] . . .

**MR. MCMANUS TO THE MCC**:        If the hearing is closed, then it's closed, and that's it.[40] . . .

**MCC CHAIRMAN TO MCC MEMBERS**:        Someone want to make a motion?[41]

---

[34] MCC's Jan. 8, 2015 Transcript, at p. 19, lines 19-22, line 24; p. 20, line 1.

[35] MCC's Jan. 8, 2015 Transcript, at p. 20, lines 2-3.

[36] MCC's Jan. 8, 2015 Transcript, at p. 20, lines 5-8.

[37] MCC's Jan. 8, 2015 Transcript, at p. 20, line 9.

[38] MCC's Jan. 8, 2015 Transcript, at p. 20, lines 10-13.

[39] MCC's Jan. 8, 2015 Transcript, at p. 20, line 14.

[40] MCC's Jan. 8, 2015 Transcript, at p. 21, lines 9-10.

[41] MCC's Jan. 8, 2015 Transcript, at p. 21, lines 19-20.

**MCC MEMBER No. 1:**     I so move.[42]

**MCC MEMBER No. 2:**     That's the easy way to do it.  I second.[43]

**MCC CHAIRMAN TO MCC MEMBERS**:     Yeah.  All in favor, say yes.[44]

**(AFFIRMATIVE RESPONSES BY MCC MEMBERS)**[45]

**MCC CHAIRMAN TO MCC MEMBERS:**     Yes, yes.  Okay.  Thank you,

guys.[46]

**THE PETITIONERS' COUNSEL TO THE MCC:**     Thank you very

much.[47] . . .

The agenda, transcript, and minutes of the MCC's January 22, 2015 meeting at which it

voted to deny the proposed Project provide further proof that the MCC closed its public hearing

on the Petitioners' NOI on January 8, 2015 and not on January 22, 2015.[48]

The agenda of the MCC's January 22nd meeting states that the MCC's "Hearing [on the

proposed Project] closed on 1/8/2015 with a final determination to be rendered [by the MCC on]

1/22/2015."[49]  This is confirmed by the transcript of the MCC's January 22nd meeting at which

the MCC's Chairman stated that "[t]he [MCC's] hearing [on the original proposed Project]

---

[42] MCC's Jan. 8, 2015 Transcript, at p. 21, line 21.

[43] MCC's Jan. 8, 2015 Transcript, at p. 21, lines 22-23.

[44] MCC's Jan. 8, 2015 Transcript, at p. 21, line 24; p. 22, line 1.

[45] MCC's Jan. 8, 2015 Transcript, at p. 22, line 2.

[46] MCC's Jan. 8, 2015 Transcript, at p. 22, lines 3-4.

[47] MCC's Jan. 8, 2015 Transcript, at p. 22, line 5.

[48] A copy of the MCC's Agenda for the MCC's January 22, 2015 meeting is attached as Exhibit 5 to Mr. Haney's PFT; a copy the Transcript of MCC's January 22, 2015 meeting ("MCC's Jan. 22, 2015 Transcript") is attached as Exhibit 2 to Mr. Haney's PFT; and the minutes of the meeting are attached to his PFT as Exhibit 6.

[49] Exhibit 5 to Mr. Haney's PFT.

closed on January 8th, with a final determination [by the MCC] on this application to be decided [at the MCC's January 22nd meeting]," and as such, "there [would] be no submissions [on the Project] by the audience [at the January 22nd meeting]."[50] These comments of the MCC's Chairman are further confirmed by the minutes of the MCC's January 22nd meeting. The minutes note that the MCC's Chairman stated at the January 22nd meeting that the MCC's Conservation Agent, Mr. McManus "[would] be providing his comments [on the original proposed Project] and the [MCC members] [would then] give their comments and then . . . [take] a vote" on approving or denying the Project.[51] The minutes also note that "[f]ollowing his review [of the original proposed Project at the January 22nd meeting], the [MCC's] Agent [(Mr. McManus)] recommended [that the MCC] den[y] the [Project] . . . without prejudice" and that the MCC accepted his recommendation by voting unanimously to deny the Project without prejudice.[52] The MCC, however, did not issue its written Order of Conditions pursuant to the MWPA and 310 CMR 10.05(6)(a) denying the proposed Project until February 11, 2015, 34 days after the MCC closed its public hearing on the Petitioners' NOI for the Project on January 8, 2015 and 13 days after expiration of the January 29, 2015 deadline for the MCC to issue its written Order of Conditions denying the Project.

Notwithstanding the highly persuasive evidence discussed above demonstrating that the MCC's Order of Conditions denying the original proposed Project was untimely under the MWPA and 310 CMR 10.05(6)(a), the MCC and the Intervenors contended  at the Adjudicatory Hearing that the Order was timely because in their view the required public hearing that a local

---

[50] MCC Jan. 22, 2015 Transcript, a p. 2, lines 12-16.

[51] Exhibit 6 to Mr. Haney's PFT (p. 3).

[52] Id.

Conservation Commission is to conduct on an NOI is a bifurcated proceeding consisting of an "evidentiary phase" and a "deliberative phase," and, as such, the 21 day deadline for the Commission to issue its Order of Conditions begins to run after the "deliberative phase." Hence, under their reading of the MWPA and 310 CMR 10.05(6)(a), the MCC's February 11, 2015 Order of Conditions was timely because the 21 day period did not begin to run on January 8, 2015, when the MCC closed the "evidentiary phase" of its public hearing on the Petitioners' NOI for the original proposed Project, but rather on January 22, 2015, when the MCC voted to deny the Project. MCC's Pre-Hearing Memorandum, at p. 10. The problem with the MCC's and the Intervenors' position is that neither the MWPA nor the Wetlands Regulations contain any provisions stating that the local Conservation Commission's public hearing on an NOI is a bifurcated proceeding consisting of an "evidentiary phase" and a "deliberative phase," and that the 21 day deadline for the Commission to issue its Order of Conditions begins to run after the "deliberative phase." As the SJC ruled in Oyster Creek, "the timing provisions in the [MWPA] are obligatory, and a local community is not free to expand or ignore them." Accordingly, the MCC's reliance Kurlander v. School Committee of Williamstown, 16 Mass. App. Ct. 350 (1983), a case involving a different statutory scheme governing the termination of public school teachers is unavailing.

Moreover, the evidence introduced at the Adjudicatory Hearing as set forth above at pp. 19-26 does not support the MCC's and the Intervenors' contention that on January 8, 2015 the Petitioners' consented to an extension of the MCC's 21 day deadline to issue its Order of Conditions on the Petitioners' NOI for the proposed Project. Indeed, on cross-examination by the Petitioners' counsel at the Hearing, the MCC's Conservation Agent, Mr. McManus, admitted that at the MCC's January 8, 2015 public hearing on the Petitioners' NOI, the Petitioners neither

requested a continuance of the public hearing nor consented to a continuance of the public

hearing in accordance with 310 CMR 10.05(b) as discussed above, at p. 18. Adjudicatory

Hearing Transcript ("AHT"), at p. 227, lines 12-18; p. 228, lines 5-12. Mr. McManus'

admission is highly probative evidence demonstrating that the MCC's public hearing on the

Petitioners' NOI closed on January 8, 2015, making January 29, 2015 the 21 day deadline under

the MWPA and 310 CMR 10.05(6)(a) for the MCC to issue an Order of Conditions on the

Petitioners' original proposed Project. While it is undisputed that the MCC met on January 22,

2015 and voted to deny the Petitioners' original proposed Project, the MCC did not issue its

Order of Conditions confirming its denial until February 11, 2015, which was after the January

29, 2015 deadline.

   In sum, the Petitioners' appeal of the SOC was not barred at the time of the appeal's

filing, and, as such, the case may proceed to the next issue for resolution: whether the

Petitioners' Revised Project Plan can be reviewed and approved in this appeal pursuant to the

Department's Plan Change Policy.

III.   **THE PETITIONERS' REVISED PROJECT PLAN CANNOT BE REVIEWED AND APPROVED IN THIS APPEAL PURSUANT TO THE DEPARTMENT'S PLAN CHANGE POLICY BECAUSE THE PETITIONERS' PROPOSED STEEL BRIDGE ALTERNATIVE IS SUBSTANTIALLY DIFFERENT FROM THEIR ORIGINALLY PROPOSED TIMBER BRIDGE AND INCREASES IMPACTS TO SALT MARSH AND LAND CONTAINING SHELLFISH.**

   A.   <u>The Requirements of the Department's Plan Change Policy</u>

   The Department's Plan Change Policy provides that:

> [t]he primary purpose of th[e] policy is to promote the intent of the [MWPA], to ensure thorough local review of work proposed in or near wetland resource areas by identifying those circumstances in which the Department will consider changes to plans filed under [NOIs] which are before the Department under appeal for [an SOC] or for which [an administrative appeal] has been filed. . . .

Department's Plan Change Policy, ¶ 1. "This policy specifically distinguishes those plan

changes which are substantial, and will require a new NOI filing [with the local Conservation Commission], from those plan changes which are deemed insubstantial and thus may be considered as part of the appeal review process." Id. The Policy specifically precludes "[t]he Department [from] . . . considering plan changes, . . . which are deemed to be substantially different from the plan acted upon by the [local] Conservation Commission and which are referenced in the Order of Conditions. Substantial plan changes are deemed to be those changes [1] which significantly modify the project configuration and [2] which result in increased impacts to wetland resource areas. . . ." Id., ¶ 5 (numerical references supplied).

Under the Policy "[t]he Department may consider plans which contain insubstantial changes from the plans acted upon by the Conservation Commission and referenced in the Order of Conditions. Insubstantial plan changes are limited to those changes which involve unchanged or decreased impacts but which do not constitute significant changes from the project configuration acted upon by the Conservation Commission . . . ." Id., ¶ 6. "[T]he burden is on the project proponent to demonstrate that the plan change is insubstantial. Specifically, the project proponent must show that the plan change results in [1] an unchanged, or not significantly changed, project configuration and [2] unchanged or decreased impact to any wetland resource areas as compared to the plan acted upon by the Conservation Commission and referenced in the Order of Conditions." Id., ¶ 7 (numerical references supplied).

As discussed below at pp. 30-50, the Petitioners failed to meet their burden under the Department's Plan Change Policy of demonstrating that their proposed steel bridge alternative: (1) is not substantially different from their originally proposed timber bridge and (2) will not increase impacts to any wetlands resources. A preponderance of the evidence at the Adjudicatory Hearing demonstrated that the steel bridge is substantially different than the timber

bridge and increases wetlands impacts to Salt Marsh and Land Containing Shellfish.

Accordingly, the Petitioners' Revised Project Plan cannot be reviewed and approved in this

appeal, but must be submitted to the MCC for review pursuant to a new NOI.[53]

### B. The Petitioners' Proposed Steel Bridge Alternative Is Substantially Different From Their Originally Proposed Timber Bridge.

#### 1. Mr. Bunker's Testimony on behalf of the Petitioners

At the Hearing, the Petitioners' witness, Mr. Bunker, testified that construction of

Petitioners' proposed steel bridge would not be substantially different from construction of the

Petitioners' originally proposed timber bridge. His testimony was based on his experience as a

licensed Professional Land Surveyor. Mr. Bunker's PFT, ¶ 1. He holds a Bachelor of Science

degree in Forestry Engineering from the University of Maine at Orono (1977) and a Master of

Landscape Architecture degree from the Harvard University Graduate School of Design (1987).

Id., ¶ 3. He has provided project design and review services for a number of residential and

commercial projects and has more than 25 years of experience in permitting projects near

wetlands areas. Id., ¶¶ 4-5.

Mr. Bunker testified that the Petitioners' steel bridge alternative will be a pre-fabricated

steel truss design consisting of three spans: (1) the Mashpee Mainland span; (2) the middle span;

and (3) the Gooseberry Island span having the following configurations. Id., ¶ 24.

> (1) The Mashpee Mainland span. This span will be 50 feet and supported by a concrete abutment at the end of Punkhorn Point Road and the first pile bent, which will be in the intertidal zone between the Mashpee Mainland Salt Marsh and the low water line. Id. The height of this span will vary from 3.0 feet to 6.0 feet above the Salt Marsh (5.2 feet to 8.2

---

[53] As a result of my ruling that the Petitioners' Revised Project Plan cannot be reviewed and approved in this appeal, the MCC's and the Intervenors' pending "Joint Motion to Strike Section 3 of [the] Petitioners' Post-Hearing Memorandum" because it purportedly "seeks to introduce, for the first time [and after the close of the Adjudicatory Hearing], an entirely new mitigation proposal [for the Petitioners' steel bridge alternative]," is denied as moot.

feet clear from the Salt Marsh to the bottom of the grating) and no piles will be in the Salt Marsh.  Id.

(2)   The Middle span.  This span will be 60 feet and supported by the two pile bents.  Id.  This span is entirely above the intertidal zone and open water, none is over Salt Marsh.  Id.

(3)   The Gooseberry Island span.  This span will be 90 feet and similar to the Mashpee Mainland span that will be supported by a pile bent in the intertidal zone and a concrete abutment on upland, and will span over Salt Marsh.  Id.  The height of this span will vary from 3.8 feet to 8.4 feet above the Salt Marsh (6.0 feet to 10.6 feet clear from the Salt Marsh to the bottom of the grating) and no piles will be in the Salt Marsh.  Id.

Mr. Bunker testified that the steel bridge will have railings along its two sides that will be steel trusses providing the longitudinal strength to support the bridge across its three spans. Id.  Every ten feet of the structure will have a cross beam connecting the structure's two trusses and carrying longitudinal beams which, in turn, will support the steel grating driving surface.  Id.  The driving surface will be composed of two strips of 3.5 feet wide, 2 inches high steel grating with a manufacturer-claimed 82% light penetration, separated by 2.0 feet wide open space.  Id.  There will be 2 feet, 2 inches from the bottom of the truss structure to the bottom of the steel grating.  Id.  It will be supported on the landward ends by concrete abutments.  Id.  The spanning sections will be supported by two bents of nine 14 inch piles each, located in the inter-tidal zone.  Id.

Mr. Bunker testified that "[t]he construction methodology for [this] alternative steel bridge will be substantially the same as that of the [originally proposed] timber pile supported structure . . . ."  Id., ¶ 25.  He testified that with the exception of the change of the bridge's design from timber to steel, it is substantially the same size, length, and width of the original timber structure and in substantially the same location.  Id., ¶ 27.  However, on cross-

examination at the Adjudicatory Hearing, Mr. Bunker admitted that the steel bridge will be 50% wider. AHT, p. 56, lines 10-24; p. 57, lines 1-24; p. 58, lines 1-24; p. 59, lines 1-5.

### 2.    Mr. Bartow's Testimony on behalf of the Department

Mr. Bartow is an Environmental Analyst in the Wetlands and Waterways Program in the Department's Southeast Regional Office with nearly 30 years of experience in the environmental field, 11 of which are in the wetlands permitting area: two years in the private sector and nine years (since 2008) with the Department. Pre-filed Testimony of Mark Bartow ("Mr. Bartow's PFT"), ¶ 1; Exhibit 1 to Mr. Bartow's PFT. He holds a Bachelor of Science degree in Environmental Science (1990) and a Master of Science degree in Plant and Soil Sciences (2000) from the University of Massachusetts at Amherst. Exhibit 1 to Mr. Bartow's PFT. His duties at the Department include reviewing NOIs pursuant to the MWPA and the Wetlands Regulations, conducting site inspections, preparing SOCs and enforcement documents, investigating complaints, providing technical compliance assistance, and testifying on behalf of the Department at Adjudicatory Hearings. Mr. Bartow's PFT, ¶ 1.

At the Adjudicatory Hearing Mr. Bartow agreed with Mr. Bunker's testimony that the Petitioners' steel bridge alternative will not be substantially different from the Petitioners' originally proposed timber bridge. He testified that "[t]he plan change as proposed by the petitioner[s] . . . is substantially the same" as the Petitioners' originally proposed timber bridge. Mr. Bartow's PFT, ¶ 22. Mr. Bartow, however, did not provide a detailed explanation for his opinion.

### 3.    Mr. Daylor's Testimony on Behalf of the Intervenor Wolpe, Atkins, and Weltman Group

I do not find persuasive Mr. Bunker's and Mr. Bartow's testimony that construction of the Petitioners' proposed steel bridge will not be substantially different from the Petitioners'

originally proposed timber bridge because, while their professional credentials are noteworthy, neither Mr. Bunker nor Mr. Bartow is a civil or construction engineer.[54] As a result, their testimony regarding the structural and engineering details of the proposed steel bridge did not carry as much weight as the testimony of Mr. Daylor, a Professional Engineer with substantial civil and construction engineering experience, especially in the environmental field, who testified on behalf of the Intervenor Wolpe, Atkins, and Weltman Group. Mr. Daylor's testimony effectively refuted Mr. Bunker's and Mr. Bartow's testimony by demonstrating that the Petitioners' steel bridge alternative is substantially different from their originally proposed timber bridge.

Mr. Daylor is a Professional Engineer with over 50 years of experience in environmental and land development planning, design, and construction, including work on hundreds of projects involving the protection of wetlands and coastal resources. Pre-filed Direct Testimony of Robert F. Daylor, PE, PLS ("Mr. Daylor's PFT"), ¶¶ 1-4.[55] As a Massachusetts Professional Engineer, Mr. Daylor is licensed by the Commonwealth's Board of Registration of Professional Engineers and Professional Land Surveyors ("the Board") and, as such, his expert testimony at the Adjudicatory Hearing comparing the engineering design and construction impacts of the Petitioners' proposed steel bridge alternative to the Petitioners' originally proposed timber bridge is subject to the Board's vigorous licensing and engineering practice requirements and carried great weight at the Hearing. http://www.mass.gov/ocabr/licensee/dpl-boards/en/about-the-board.html; Sunset City, supra, 2017 MA ENV LEXIS 35, at 29. He has been qualified as an

---

[54] AHT, p. 41, lines 10-14; p. 247, lines 12-24; p. 248, lines 1-16; p. 256, lines 4-12.

[55] In addition to being a Professional Engineer, Mr. Daylor is also a Professional Land Surveyor. Mr. Daylor's PFT, ¶¶ 1-2. He holds a Bachelor of Science in Civil Engineering degree and a Master of Science in Civil Engineering degree with an environmental engineering focus, from Northeastern University in Boston, and studied at Harvard University's Graduate School of Design as a post graduate Loeb Fellow in Advanced Environmental Studies. Id.

expert witness in land development issues, hydrology, drainage design, stormwater management, and wetlands protection and mitigation issues in Massachusetts Superior Court, Massachusetts Land Court, the United States District Court for the District of Massachusetts, and the Massachusetts Appellate Tax Board. Mr. Daylor's PFT, ¶ 6. He has testified in many Adjudicatory Hearings involving Wetlands and Tidelands (c. 91) permit appeals, and has testified on behalf of project proponents or opponents in court litigation or administrative appeals, including on behalf of public sector clients such as the Commonwealth. Id.

Here, Mr. Daylor testified that "[t]he [Petitioners'] revised proposal . . . to use a pre-fabricated steel truss bridge with spans of 50 feet, 60 feet and 90 feet and intermediate piers located in the beach resource area of the intertidal zone of the arm of the Popponesset Bay separating Punkhorn Point [from] Gooseberry Island . . . will cause increased [wetlands] resource damage both during construction and as a result of the finished bridge itself. Id., ¶ 12. He testified that "one example of the increased, adverse impacts from the completed, new bridge, [is that] both the revised Punkhorn Point abutment and the approach to it have been enlarged, with resultantly greater negative impacts on protected [wetlands] resource areas." Id. He testified that "Sheet two of the truss bridge is significantly heavier than the [original] timber bridge proposal[,] . . . with significantly longer spans the loads transferred to the end abutments (and intermediate piers) are significantly larger than the 14 foot timber spans," and, accordingly, "the concrete abutment and concrete approach wing walls are significantly larger." Id.

Mr. Daylor refuted Mr. Bunker's testimony that "[t]he construction methodology [for the steel bridge] will be substantially the same as that of the [original] timber pile supported structure . . . ." Id., ¶ 13. He testified that "[w]hile there are several manufacturers of prefabricated steel truss bridges which can be assembled and erected at the site, that construction

methodology [for such a bridge] is 'not substantially the same' as timber short-span construction." Id. He based his opinion on US Army Field Manual FM 5-277, which he testified "is the commonly used manual for the construction of the type of [steel] bridge [that the Petitioners are] now proposing." Id. Based on this Manual, Mr. Daylor testified that "[w]hile it is theoretically possible to assemble and construct the bridge from one end using a cantilever launching technique, manpower and light construction equipment, nothing in the [project] site allows such a technique for [a number of] reasons." Id.

First, according to Mr. Daylor, "[a] single truss bay (a ten foot long section) without the deck weigh[s] 5,520 [pounds] and requires a launching nose bay which weigh[s] 2,000 [pounds]." Id., ¶ 13.1. He testified that "[t]he decking and diagonal bracing adds another 3,600 [pounds] per panel," and "[a] single, completed 10 foot long bay weights over 4.5 tons which is significantly heavier that the 14 foot timber span." Id.[56]

Second, Mr. Daylor testified that US Army Field Manual FM 5-277 "recommends [that] the approach 'should be two lanes and straight for 150 feet'" and that the Petitioners' proposed construction of the steel bridge fails to meet this standard because "Punkhorn Point Road is only two rods wide (33 feet) and consists of a single 10-12 foot wide track," and as a result, "[t]here is simply no room . . . to get a straight run to assemble and cantilever launch the bridge." Id.,

---

[56] In his rebuttal testimony, Mr. Bunker contended that Mr. Daylor had overestimated the weight of the various structural components of the proposed steel bridge by approximately 50% based on Mr. Bunker's purported review of the manufacturer specifications for the steel bridge that the Petitioners propose to build. Rebuttal Testimony of Thomas J. Bunker, PLS ("Mr. Bunker's Rebuttal PFT"), ¶ 2. Mr. Bunker, however, did not refute Mr. Daylor's testimony that the steel bridge will be "significantly heavier" than the originally proposed timber bridge. On cross-examination at the Adjudicatory Hearing, Mr. Bunker admitted that he did not perform any analysis of the weight differential between the originally proposed timber bridge and the proposed steel bridge alternative. AHT, p. 58, lines 20-24. I also credit and accord Mr. Daylor's testimony more weight than Mr. Bunker's testimony because as noted above in the text, Mr. Bunker is not a civil or construction engineer while Mr. Daylor is a Professional Engineer with over 50 years of experience in environmental and land development planning, design, and construction, including work on hundreds of projects involving the protection of wetlands and coastal resources. Mr. Daylor's PFT, ¶ 4.

¶ 13.2.[57]

Third, Mr. Daylor testified that US Army Field Manual FM 5-277 provides that "[i]f the bridging is to be unloaded and stacked at the site - the site must be about 150 feet wide." Id., ¶ 13.3. He testified that "[t]here is no place on Punkhorn Point which could be made 150 feet wide without clearing on private property for over [100] feet and quite possibly encroaching upon protected wildlife habitat in an adjacent isolated wetland." Id. He stated that the 150 feet width is necessary because US Army Field Manual FM 5-277 provides that the steel bridge must be constructed as follows:

> [E]ach bridge bay (10 foot long section) has to be assembled and connected to the adjacent bay. Then the first bay is set on rollers on the new abutment and rolled out in a "launching nose frame." Then the third bay is connected to the second, etc. and the bridge is slowly pushed out towards the first pier[,] but there always has to be a cantilevered section of the assembled bridge which is on the landward side of the rollers which counterbalances the elevated portion of the bridge. The space for the counterbalance has to be level with the bridge, and aligned straight with the bridge.

Id., ¶ 13.4. Mr. Daylor testified that with respect to the Petitioners' proposed steel bridge "[t]he bare assembly (the three forward bays in the launch nose have no decks to save weight) for a 50 foot span requires a straight assembled bridge of a length of 80 feet (30 feet counterweighted over the land) and weighs 17.5 tons." Id. He testified that "[t]here is no place on the project site which allows this alignment," and that "the [Petitioners'] proposed [steel] bridge has a 10%

---

[57] At the Hearing, Mr. Bunker did not dispute Mr. Daylor's testimony that US Army Field Manual FM 5-277 "recommends [that] the approach 'should be two lanes and straight for 150 feet,'" but attempted to undercut or minimize the value of this important engineering standard by contending that the standard "is presumably the optimal condition under which [the steel bridge] can be constructed, but by no means a requirement." Mr. Bunker's Rebuttal PFT, ¶ 3. Mr. Bunker also contended that there is enough room at the project site to construct the steel bridge because in his opinion the bridge can be built in 10 foot long bays, which would be added to the total assembly one at a time from the mainland side as the structure is pushed (or pulled) toward Gooseberry Island, and that by using this construction methodology, only 12 to 15 feet of work area will be necessary to construct the bridge. Id. However, Mr. Bunker did not explain how this construction work could be done without the barge delivering the bridge sections touching the bottom of the shellfish habitat that is part of the Intervenor Mashpee Wampanoag Tribe's shellfish grant. Mr. Bunker's testimony on these engineering aspects of the proposed steel bridge is also not persuasive given that he is not a civil or construction engineer while Mr. Daylor is such an engineer and I credit his testimony over Mr. Bunker's testimony for the reasons set forth above in the text.

grade which may be impossible to launch using this accepted technique because the counterweight section has to be level with the elevated bridge." Id.

Mr. Daylor testified that "[s]ince, in [his] professional opinion, the [project] site cannot accommodate an assembly and launch from Punkhorn Point as Mr. Bunker testifie[d], the only alternative is to assemble the [steel bridge] spans elsewhere, barge them to the site and then erect them at the site by a large barge-mounted crane." Mr. Daylor's PFT, ¶ 14. He testified that alternative construction would "rais[e] a significant risk to land containing shellfish resources from the heavy barge grounding out in the shallow creek" because "[t]he three assembled bridge spans [would] weigh 45,600 [pounds] (22.8 tons), 54,720 [pounds] (27.4 tons), and 82,080 [pounds] (41 tons) respectively," and "would most likely require both a heavy crane barge and a second barge carrying the assembled bridge sections." Id. He testified that the Petitioners presented "no evidence . . . that these barges could even fit in the creek" and no evidence "of the impacts of such an approach on coastal resources." Id. He testified that the Petitioners' evidence "is completely silent on construction impacts except to [contend that the steel bridge] would be constructed just like the timber bridge," which in "[his] opinion . . . is an impossibility." Id., ¶ 15.

## C.   The Petitioners' Proposed Steel Bridge Alternative Will Increase Wetlands Impacts to Salt Marsh and Land Containing Shellfish.

### 1.   Mr. Bunker's and Mr. Forns' Testimony on behalf of the Petitioners

#### a.   Mr. Bunker's Testimony

Mr. Bunker testified that as a result of the Department's denial of the original proposed Project for failing to meet the Performance Standards for work in Salt Marsh as set forth in 310 CMR 10.32, the Petitioners addressed the Department's concerns by changing the bridge's design from a timber bridge to a structure built entirely of steel. Mr. Bunker's PFT, ¶ 23. He

testified that the new design addressed the Department's concerns because "[a] steel structure [bridge] allows for a greater span between supports and thereby enables the Petitioners to propose a design with no piles in the Salt Marsh," and "[i]n addition, the steel structure presents less of a profile and thereby allows greater light penetration" to the Salt Marsh. Id. The Petitioners' other expert witness, Mr. Forns, agreed with Mr. Bunker's testimony.

### b.   Mr. Forns' Testimony

Mr. Forns is a Senior Environmental Scientist and principal of Applied Marine Ecological Lab ("AMEL"), an environmental consulting firm based in Falmouth, Massachusetts. Pre-filed Direct Testimony of Joseph M. Forns ("Mr. Forns'") PFT, ¶ 1. He holds a Bachelor of Science degree from Villanova University in Villanova, Pennsylvania (1966). Exhibit A to Mr. Forns' PFT. For nearly 40 years (since 1978), he has provided consulting and support services to various entities, including government agencies, industry, and private organizations on projects involving marine pollution and ecological issues. Id., ¶ 1. He has extensive experience in wetlands and marine resource assessments, multivariate ecological investigations, aquaculture projects, oil and hazardous materials analyses, geotechnical groundwater contamination evaluations, and coastal marine process design engineering. Id., ¶ 2.

Mr. Forns testified that he is knowledgeable of the environmental conditions at the Property as a result of having reviewed the Petitioners' NOI for the original proposed Project, Original Project Plan, and Revised Project Plan, and conducting an environmental assessment of the site with particular emphasis on the Salt Marsh habitats that the Department identified in its SOC denying the original proposed Project. Id., PFT, ¶ 3. He testified that the Revised Project Plan directly addresses the impacts to Salt Marsh and potential shading impacts to Salt Marsh

habitat that the Department identified in its SOC denying the original proposed Project based on the timber bridge design. Id., ¶ 4.

Mr. Forns testified that "[a]ny realistic evaluation of potential adverse impacts [to Salt Marsh] due to diminished sunlight . . . needs to incorporate the overall health of the [Salt Marsh] system as a whole, as well as any incidental shading." Id., ¶ 15. He opined that "[g]iven the open spaced deck surface, separation of steel grated decking, and the elevation of the decking above the marsh surface, it is unlikely there will be any measurable destruction of salt marsh habitat or adverse impact to the underlying marsh surfaces or overall salt marsh system (1.5 acres on the island and 100+/- acres on the mainland)." Id. However, while contending that the decking on the steel bridge alternative will allow for greater light penetration to the Salt Marsh than the originally proposed timber bridge, Mr. Forns admitted on cross-examination at the Adjudicatory Hearing that the "bridge decking [for the steel bridge] doesn't differ" from the decking for the timber bridge. AHT, p. 102, lines 15-23.

Mr. Forns testified that "[the] [m]itigation proposed [by the Petitioners] for any potential impacts resulting from this project on all associated resource areas will enhance the vitality of this salt marsh system," and that the "[t]ransplanting and relocation of salt marsh plants to identified disturbed areas as identified in the [Petitioners' mitigation plan] will result in no net losses to the existing indigenous salt marsh habitat and will actually increase the overall area of viable and productive salt marsh habitat." Id., ¶ 17. He testified that the Petitioners' steel bridge alternative will not destroy any Salt Marsh as the Department had previously concluded regarding the originally proposed timber bridge because "the [steel] structure [alternative] allows for the spanning of the Salt Marsh and eliminates all piles from the Salt marsh." Id., ¶ 19. However, on cross-examination at the Adjudicatory Hearing, he admitted that the proposed steel

bridge will span over Land Containing Shellfish and the Intervenor Mashpee Wampanoag Tribe's shellfish grant area.  AHT, p. 113, lines 8-10.

Mr. Forns attempted to minimize the steel bridge's impacts to Land Containing Shellfish by testifying that "this portion of Popponesset Bay is closed to shellfishing" and that "[he] found no measurable quantities of shellfish [exist] within the project site."  Mr. Forns' PFT, ¶ 8.  As discussed below, Mr. Forns' testimony was effectively refuted by Mr. Daylor's and Ms. Ball's testimony.

### 2.      Mr. Bartow's Testimony on behalf of the Department

Mr. Bartow agreed with Mr. Bunker's and Mr. Forns' testimony that the Petitioners' proposed steel bridge alternative will decrease impacts to protected wetlands areas at the Project site.  Specifically, he testified that the Petitioners' Revised Project Plan meets the Performance Standards for work in Salt Marsh at 310 CMR 10.32 because the Plan's proposed steel bridge: "(a) . . . eliminates pilings in [S]alt Marsh and (b) is an open grate design which minimizes shading."  Mr. Bartow's PFT, ¶ 21.  He testified that "[t]he open grate design reportedly will allow greater than 50% light penetration to the salt marsh vegetation below [the structure]," and "that the revised design would not result in any adverse effects to the salt marsh."  Id.

Mr. Bartow also testified that construction of the Petitioners' steel bridge would also satisfy the Wetlands Regulations' Performance Standards for two other protected wetlands areas: Land Containing Shellfish and Coastal Beach/Tidal Flat.  Id., ¶¶ 23-24.  With respect to Land Containing Shellfish, he testified that the Petitioners' steel bridge alternative "would meet the performance standards for [work in] Land Containing Shellfish [because the] petitioner[s] propos[e] to remove and relocate any individual shellfish in the area of the proposed piles and because [this protected wetlands area] would be returned substantially to its former productivity

in less than one year from commencement [of work] in accordance with 310 CMR 10.34(5)." Id., PFT, ¶ 23.[58]  With respect to Coastal Beach/Tidal flat, he testified that that the Petitioners' steel bridge alternative "would meet the performance standards for [this protected wetlands area as set forth] at 310 CMR 10.27(3) and 10.27(6)" because "the [bridge's] pilings located in [that area as] shown on the Revised Plan . . . would not have an adverse effect on [that] . . . area . . . based on [his] observations . . . at the time of [his] site inspection and [his] experience." Id., ¶ 24.  He testified that "[he] believe[s] the area is a low energy environment," that "[he] [neither] observe[d] any evidence of erosion, scour, or sedimentation," nor "observe[d] any strong current or tidal action in the vicinity of the project." Id.  He testified "that any affects created by the [bridge's] pilings would be negligible and small enough to be disregarded as defined at 310 CMR 10.23 under Adverse Effect." Id.

Lastly, Mr. Bartow opined that that the Petitioners' proposed steel bridge alternative will not adversely affect Salt Marsh, Land Containing Shellfish, and Coastal Beach/Tidal Flat based on his August 27, 2015 "observ[ation] [of] a steel grate bridge in Barnstable[, Massachusetts] of a design similar to that [of the Petitioners'] proposed [steel bridge as depicted] in the [Petitioners'] Revised [Project] Plan." Id., ¶ 25.  He testified that "[t]he bridge crosses an intermittent stream and Bordering Vegetated Wetland[s] surrounded by mature trees," and that "[b]ased on [his] observations, [he] believe[s] that the bridge is not adversely impacting the [protected wetlands] resource areas that it spanned." Id.

> **3.    Mr. Daylor's Testimony on Behalf of the Intervenor Wolpe, Atkins, and Weltman Group and Ms. Ball's Testimony on Behalf of the Intervenor Mashpee Wampanoag Tribe Group**

---

[58] Mr. Bartow testified as such even though, as Ms. Ball noted in her testimony, the Intervenor Mashpee Wampanoag Tribe has an exclusive shellfish grant in the area.

I do not find persuasive Mr. Bunker's, Mr. Forns', and Mr. Bartow's testimony that the

Petitioners' proposed steel bridge alternative will decrease impacts to wetlands areas at the

Project site because their testimony was effectively refuted by Mr. Daylor's testimony on behalf

of the Intervenor Wolpe, Atkins, and Weltman Group and Ms. Ball's testimony on behalf of the

Intervenor Mashpee Wampanoag Tribe Group. Mr. Daylor's and Ms. Ball's testimony

demonstrated that construction of the steel bridge will increase impacts to Salt Marsh and Land

Containing Shellfish.

### a.     Mr. Daylor's Testimony

As noted previously, Mr. Daylor testified that "[t]he [Petitioners'] revised proposal . . . to

use a pre-fabricated steel truss bridge with spans of 50 feet, 60 feet and 90 feet and intermediate

piers located in the beach resource area of the intertidal zone of the arm of the Popponesset Bay

separating Punkhorn Point [from] Gooseberry Island . . . will cause increased [wetlands] resource

damage both during construction and as a result of the finished bridge itself. Mr. Daylor's PFT,

¶ 12. He testified that "one example of the increased, adverse impacts from the completed, new

bridge, [is that] both the revised Punkhorn Point abutment and the approach to it have been

enlarged, with resultantly greater negative impacts on protected [wetlands] resource areas." Id.

He testified that "Sheet two of the truss bridge is significantly heavier than the [original] timber

bridge proposal[,] . . . with significantly longer spans the loads transferred to the end abutments

(and intermediate piers) are significantly larger than the 14 foot timber spans," and, accordingly,

"the concrete abutment and concrete approach wing walls are significantly larger." Id.

Mr. Daylor also testified that "the [project] site cannot accommodate an assembly and

launch [of the steel bridge] from Punkhorn Point as Mr. Bunker testifie[d]," and as a result, "the

only alternative is to assemble the [steel bridge] spans elsewhere, barge them to the site and then

erect them at the site by a large barge-mounted crane." Mr. Daylor's PFT, ¶ 14. He testified that

alternative construction would "rais[e] a significant risk to land containing shellfish resources

from the heavy barge grounding out in the shallow creek" because "[t]he three assembled bridge

spans [would] weigh 45,600 [pounds] (22.8 tons), 54,720 [pounds] (27.4 tons), and 82,080

[pounds] (41 tons) respectively," and "would most likely require both a heavy crane barge and a

second barge carrying the assembled bridge sections." Id. He testified that the Petitioners

presented "no evidence . . . that these barges could even fit in the creek" and no evidence "of the

impacts of such an approach on coastal resources." Id.

### b.   Ms. Ball's Testimony

Ms. Ball is a Project Manager and Senior Ecologist at the Horsley Witten Group, Inc., an

environmental consulting firm in Sandwich, Massachusetts, with more than 20 years of

significant professional experience as a wetlands consultant. Ms. Ball's PFT, ¶ 1. Her expertise

is in wetlands science, botany, ecology, rare species and wildlife habitat assessments, impact

assessment, wetlands permitting, and environmental policy evaluation. Id. She holds a Bachelor

of Science degree in Biology from Muhlenberg College in Allentown, Pennsylvania (1991) and a

Master of Science degree in Plant Biology from the University of Massachusetts, Amherst,

Massachusetts (1994). Id., ¶ 2; Exhibit 1 to Ms. Ball's PFT.

Ms. Ball also is a Professional Wetland Scientist ("PWS"), certified through the Society

of Wetland Scientists ("SWS"),[59] and a Certified Wetland Scientist in the State of New

Hampshire based on a certification process which has an eligibility component and requires both

---

[59] The Society of Wetland Scientists is an international organization based in Madison, Wisconsin with over 3,000 members whose mission "is to promote understanding, conservation, protection, restoration, science-based management, and sustainability of wetlands." http://www.sws.org/About-SWS/overview.html.

written and field examinations.[60]  Ms. Ball's PFT, ¶ 3.  She is a member of SWS and the

Association of Massachusetts Wetland Scientists ("AMWS"),[61] two professional organizations

that promote wetland science and policy and the exchange of information related to wetlands.

Id., ¶ 4.  She is also a member of the Board of Directors for the Massachusetts Association of

Conservation Commissions ("MACC"), a state-wide organization dedicated to providing

environmental education and training for members of local Conservation Commissions

and advocating for environmental protection.  Id.

During the course of her career, Ms. Ball has performed hundreds of field delineations of

coastal and freshwater wetlands resource areas in accordance with federal, state, and local

delineation requirements.  Id., ¶ 5.  She has also prepared numerous permit applications, written

project narratives, and reviewed projects on behalf of local Conservation Commissions requiring

federal, state, and/or local permits pursuant to laws, regulations, and policies governing wetlands

protection, including the MWPA and the Wetlands Regulations.  Id.  She frequently appears

before local Conservation Commissions and state and federal regulatory authorities as a project

representative or as a municipal consultant.  Id.  She has also served as an expert witness in the

areas of wetland delineation and has provided expert testimony in evidentiary Adjudicatory

Hearings involving Department issued wetlands permits and has served as an expert witness in

Massachusetts Land Court.  Id., ¶ 6.

Ms. Ball testified that she is very familiar with the Petitioners' original Project Plan and

revised Project Plan as a result of having served as the Intervenor Mashpee Wampanoag Tribe's

---

[60] See https://www.nhes.nh.gov/elmi/products/licertocc/documents/wetlands.pdf.

[61] AMWS was established in 1991 and is comprised of wetlands professionals from a number of states, including
Massachusetts, Connecticut, Rhode Island, New Hampshire, and Maine, who have diverse expertise in the wetlands
field.  http://www.amws.org/the_organization.html.  "[Its] members are wetland scientists, soil evaluators,
engineers, conservation commission agents, regulatory officials[,] and other environmental professionals."  Id.

wetlands expert since September 2014, when the Petitioners first presented their original Project Plan to the MCC. Id., ¶¶ 7-8. As part of her environmental consulting work for the Tribe, she visited the project site on September 26, 2014 with Mr. Green, the Tribe's Director of Natural Resources, accessing the site from the Town Landing at the end of Punkhorn Point Road and traversing the channel between the mainland and the Salt Marsh surrounding Gooseberry Island. Id., ¶ 8. During the site visit, she observed the expanse of Salt Marsh along the Mashpee mainland and surrounding Gooseberry Island, and the approximate location of the proposed bridge. Id. She also observed several members of the Intervenor Mashpee Wampanoag Tribe gathering and tending to harvested shellfish (primarily oysters) and observed shellfish along the sediment surface, growing among the Salt Marsh grasses, and in the waters. Id.

Ms. Ball testified that the Project site is located within an area that is mapped as shellfish habitat by the Town of Mashpee and DMF and also protected under the Intervenor Mashpee Wampanoag Tribe's Private Shellfish Grant that it received from the Town in 1977 pursuant to G.L. c. 130, §§ 57 – 68A. Id., ¶ 9.[62] She testified that the Tribe's Shellfish Grant is valid through 2027 and occupies the entirety of the tidal creek between the Mashpee mainland at Punkhorn Point Road and Gooseberry Island and nearly encircles the Island. Id.

Ms. Ball testified that under the Wetlands Regulations at 310 CMR 10.32(1), "Salt marshes are significant to protection of marine fisheries, wildlife habitat, and where there are

---

[62] Mr. Green, the Intervenor Mashpee Wampanoag Tribe's Assistant Director of Natural Resources, corroborated Ms. Ball's testimony. Pre-filed Direct Testimony of George "Chuckie" Green ("Mr. Green's PFT"), ¶¶ 1-2. He testified that the Tribe "has operated a shellfish grant around Gooseberry Island and in Popponesset Bay Proper since 1977." Id., ¶ 2. He testified that "[i]n 2008 the Tribe was awarded a Tribal Wildlife Grant (TWG) and established the Popponesset Bay Restoration Project," which "was designed to improve water quality by the creation of a sustainable oyster aquiculture farm to reduce nitrogen in the estuary." Id., ¶ 3. He testified that "[i]n 2012 the Tribe received the [federal Environmental Protection Agency's ("EPA")] Environmental Merit Award for demonstrating that [the Tribe] could assist in restoration through this process," and that "[t]he Tribe sustains this project through the sale of shellfish which could be affected with the [Applicant's] introduction of a Bridge, house and septic system" at the project site. Id., ¶ 4.

shellfish, to protection of land containing shellfish," and as a result, "any destruction of the salt marsh that would have an adverse effect on the productivity of the salt marsh, in turn, would also directly impact the productivity of Land Containing Shellfish." Id., ¶ 14. Under the Wetlands Regulations at 310 CMR 10.34(4), "[e]xcept as provided in 310 CMR 10.34(5),[63] any project on land containing shellfish shall not adversely affect such land or marine fisheries by a change in the productivity of such land caused by: . . . changes in water quality, including, but not limited to, other than natural fluctuations in the levels of salinity, dissolved oxygen, nutrients, temperature or turbidity, or the addition of pollutants." Id.

Ms. Ball supported her testimony that the project area is Land Containing Shellfish by relying on a March 27, 2014 letter written by DMF that assessed the detrimental impact that the Applicant's construction of a timber bridge would have on that area. Ms. Ball's PFT, ¶ 15; Exhibit 6 to Ms. Ball's PFT. DMF stated the following in the letter, which I find to be also pertinent to the Petitioners' steel bridge alternative.

DMF confirmed that "[t]he Mashpee Wampanoag Tribe possesses a shellfish grant that is located on the north, east, and south-facing sides of Gooseberry Island [that] . . . has been in operation since the 1970's." Exhibit 6 to Ms. Ball's PFT. DMF stated that the Tribe was "currently grow[ing] out American oysters [at the project site], but [wanted] the opportunity to grow out other shellfish species as well." Id. DMF stated that "[q]uahogs were stocked on the south side of [Gooseberry] [I]sland while soft shell clam seed was planted on the north side of

---

[63] 310 CMR 10.34(5) provides that:

> Notwithstanding the provisions of 310 CMR 10.34(4), projects which temporarily have an adverse effect on shellfish productivity but which do not permanently destroy the habitat may be permitted if the land containing shellfish can and will be returned substantially to its former productivity in less than one year from the commencement of work, unless an extension of the Order of Conditions is granted, in which case such restoration shall be completed within one year of such extension.

the island." Id.[64] DMF stated that although "[t]he waters surrounding Gooseberry Island are classified 'Conditionally Approved,'" meaning that "shellfish may not be harvested from April 1 to October 31 of any year," this classification "does not negate its value as shellfish habitat." Id. Additionally, DMF stated that while shellfish cannot be harvested during that period, the shellfish "nevertheless serve as important brood stock for the area and provide forage for numerous other species of finfish and invertebrates." Id.

Ms. Ball testified that the Petitioners' Revised Project Plan "proposes a steel span bridge that avoids the placement of pilings within Salt Marsh with a narrower profile that allegedly allows for greater light penetration," but that "this revised design introduces the potential for additional adverse effects on the coastal resource areas that must be considered." Ms. Ball's PFT, ¶ 20. She testified that "[i]n [her] opinion, direct avoidance of salt marsh impacts alone would not eliminate impacts to salt marsh . . . ." Id., ¶ 21. She testified that "[t]he revised bridge design is supported by two 9 x 14-inch pile bent supports with concrete bridge abutments at either end [that] . . . would continue to be placed within close proximity to the Salt Marsh – as close as 3 to 4 feet on the eastern-most pile bent structure." Id. She testified that "[t]he placement of these massive structures in close proximity to the Salt Marsh in a Velocity Zone raises concerns regarding the potential for ice build up around the pilings during winter months, which has the potential to scour the Salt Marsh, leading to adverse effects on the productivity of the salt marsh." Id. She testified that "[a]dditional considerations for potential adverse effects on the Salt Marsh include the potential for accumulation of debris following storm events that could be exacerbated by the proximity of the pile bent supports to the Salt Marsh." Ms. Ball's PFT, ¶ 21.

---

[64] Mr. Green testified that "[s]oftshell claims exist within the footprint of the bridge and [the Intervenor Mashpee Wampanoag Tribe's] members partake in Sustenance Harvest of ribbed mussels, softshell clams, and quahogs annually." Mr. Green's PFT, ¶ 8.

Ms. Ball took issue with Mr. Bunker's and Mr. Forns' testimony that the Petitioners' steel bridge alternative will result in decreased impacts to wetlands resources compared to the initial timber bridge design. Id., ¶¶ 22-26.  Specifically, she refuted their testimony that the open grating system in the deck of steel bridge will result in greater light penetration to the underlying Salt Marsh surface than the originally proposed timber bridge. Id.  She testified that Mr. Bunker and Mr. Forns "overlooked . . . that the intended advantages for using open grid planking to allow light penetration to vegetation beneath are overshadowed by the potential for vehicular pollutants to fall through the open grating and onto the sensitive resources below." Id., ¶ 23. She testified that "[w]hile this type of design may be appropriate for a smaller dock or pier that supports only foot traffic, this may not be an appropriate design in the context of this project." Id.

Ms. Ball also refuted Mr. Bunker's and Mr. Forns testimony by relying on a recent (2012) study on alternative decking materials for elevated structures over Salt Marshes that was conducted in Georgia by the University of Georgia's Skidaway Institute of Oceanography ("the Skidaway Institute Study").[65]  Ms. Ball's PFT, ¶ 24; Exhibit 8 to Ms. Ball's PFT.  The Skidaway Institute Study "revealed that open grating on elevated structures offer very little amelioration in terms of shading to underlying vegetation." Ms. Ball's PFT, ¶ 24; Exhibit 8 to Ms. Ball's PFT. Specifically, the results of the Skidaway Institute Study demonstrated that "alternative decking

---

[65] The University of Georgia's Skidaway Institute of Oceanography "is a multidisciplinary research and training institution located on Skidaway Island near Savannah[,] [Georgia], which "was founded in 1967 . . . to conduct research in all fields of oceanography." http://www.skio.uga.edu/about/uga-skidaway-institute-story. "The Institute's primary goals[,] [include] further[ing] [the] understanding of marine and environmental processes, [and] conduct leading-edge research on coastal and marine systems . . . ." Id. "Institute scientists conduct basic research across a broad range of subdisciplines, covering not only local economic and environmental issues, but also global processes and phenomena . . . ." Id. The Institute's research activities are funded by federal and state agencies, including by the National Science Foundation ("NSF"), the National Oceanic and Atmospheric Administration ("NOAA"), the U.S. Department of Energy ("DOE"), the U.S. Environmental Protection Agency ("EPA"), the Office of Naval Research ("ONR"), and the Georgia Department of Natural Resources. Id.

materials do not ameliorate the impacts of dock shading" and that the "the elevation of the sun is only high enough to allow sunlight to penetrate through grated materials during spring, when [sunlight] penetration is relatively limited, and during summer, when penetration is at its greatest." Ms. Ball's PFT, ¶ 24; Exhibit 8 to Ms. Ball's PFT, at p. 4. The Skidaway Institute Study noted that "[e]ven [during the summer], grated materials provide less than 10% additional PAR [photosynthetically active radiation, i.e., light level intensity] under docks when compared to a traditional planked walkway." Id. The Skidaway Institute Study also pointed out that "[b]ecause the elevation of the sun is related to latitude, [the study's] results are applicable from Skidaway Island [in Georgia] north along the US east coast." Id. Ms. Ball testified that "[r]esults in northern latitudes would [be] . . . lesser light penetration beneath this alternative grate decking." Ms. Ball's PFT, ¶ 24.

Ms. Ball testified that "[b]ased upon the results of [the Skidaway Institute Study], . . . the proposed [steel bridge alternative due], in part due to its massive size and its east-west orientation, would continue to shade the underlying salt marsh vegetation, and lead to adverse effects on the productivity of the Salt Marsh and the [growth] and composition of the salt marsh vegetation." Id., ¶ 25. As a result, Ms. Ball opined that she "[did] not believe that the revised bridge design would be protective of the Salt Marsh or the other adjacent coastal resource areas or the interests they protect under the [MWPA]." Id., ¶ 26. She testified that "[w]hile the project would avoid direct Salt Marsh impacts, . . . [the] design would not address the long term adverse effects on the water quality and the potential for Salt Marsh degradation that continues to prohibit the ability of this project to meet the performance standards under the . . . Wetlands . . . Regulations." Id.

Ms. Ball also took issue with the Petitioners' mitigation plan to provide "salt marsh restoration/re-vegetation" to mitigate for the steel bridge's impacts to Salt Marsh. Id., ¶ 29. She testified that "rather than serving as mitigation, this mitigation plan will likely have unintended consequences and impacts on . . . Coastal Beach/Tidal Flats and Land Containing Shellfish and areas designated as part of the Tribe's Aquaculture Grant," and, as a result, "[a]ny claims that the [revised] proposed project would improve existing conditions, would therefore be flawed." Id.

**CONCLUSION**

Based on the testimonial and documentary evidence introduced at the Adjudicatory Hearing as discussed above, I recommend that the Department's Commissioner issue a Final Decision: (1) affirming the Department's SOC denying the Petitioners' original proposed Project because the Petitioners waived any objections to the SOC by submitting a Revised Project Plan to the Department in this appeal; and (2) denying review and approval of the Petitioners' Revised Project Plan pursuant to the Department's Plan Change Policy because the Petitioners' proposed steel bridge alternative is substantially different from their originally proposed timber bridge and increases wetlands impacts to Salt Marsh and Land Containing Shellfish. As a result, the Petitioners' Revised Project Plan cannot be reviewed and approved in this appeal, but must be submitted to the MCC for review pursuant to a new NOI.

Date: 06/16/17

Salvatore M. Giorlandino
Chief Presiding Officer

**NOTICE-RECOMMENDED FINAL DECISION**

This decision is a Recommended Final Decision of the Chief Presiding Officer. It has been transmitted to the Commissioner for his Final Decision in this matter. This decision is therefore not a Final Decision subject to reconsideration under 310 CMR 1.01(14)(d) and/or 14(e), and may not be appealed to Superior Court pursuant to G.L. c. 30A. The Commissioner's Final Decision is subject to rights of reconsideration and court appeal and will contain a notice to that effect. Because this matter has now been transmitted to the Commissioner, no party and no other person directly or indirectly involved in this administrative appeal shall neither (1) file a motion to renew or reargue this Recommended Final Decision or any part of it, nor (2) communicate with the Commissioner's office regarding this decision unless the Commissioner, in his sole discretion, directs otherwise.

## SERVICE LIST

**Petitioners/Applicants:**          Gooseberry Island Trust and
                                     SN Trust;

        **Legal representative:**          Brian J. Wall, Esq.
                                     Troy Wall Associates
                                     90 Route 6A
                                     Sandwich, MA 02563
                                     **e-mail:** bjw@troywallassociates.com;

**The Local Conservation Commission:**          Mashpee Conservation Commission
                                  c/o     Andrew R. McManus , Conservation Agent
                                          Cynthia Bartos , Administrative Secretary
                                          16 Great Neck Road North
                                          Mashpee, MA 02649
                                          **e-mail:** amcmanus@mashpeema.gov
                                                  conservation@mashpeema.gov;

        **Legal Representatives:**          Patrick J. Costello, Esq.
                                     Kathleen E. Connelly, Esq.
                                     Louison, Costello, Condon &
                                     Pfaff, LLP
                                     101 Summer Street
                                     Boston, MA 02110
                                     **e-mail:** Pcostello@lccplaw.com
                                     **e-mail:** KConnolly@lccplaw.com;

**Intervenors Robert A. Wolpe, Michelle A. Wolpe, James C.
Atkins, Jr., and John J. Weltman:**

        **Legal Representatives:**          Brian M. Hurley, Esq.
                                     John E. Bowen, Esq.
                                     Rackemann, Sawyer & Brewster
                                     160 Federal Street
                                     Boston, MA 02110
                                     **e-mail:** bhurley@rackemann.com
                                     **e-mail:** jbowen@rackemann.com;

**(continued next page)**

**(continued from preceding page)**

**Intervenors Mashpee Wampanoag Tribe and 12 of its Tribal Members:**

| | |
|---|---|
| **Legal Representatives:** | Mark C. Tilden, Esq. |
| | Tilden Toelupe LLC |
| | 300 E Miller Ct |
| | P.O. Box 1296 |
| | Castle Rock, CO 80104 |
| | **e-mail:** mtilden@tildentoelupe.com; |

| | |
|---|---|
| **The Department:** | Jim Mahala, Section Chief, Wetlands Program |
| | MassDEP/Southeast Regional Office |
| | Bureau of Water Resources |
| | 20 Riverside Drive |
| | Lakeville, MA 02347 |
| | **e-mail:** Jim.Mahala@state.ma.us; |
| | |
| | Mark Bartow, Wetlands Analyst |
| | MassDEP/Southeast Regional Office |
| | Bureau of Water Resources |
| | 20 Riverside Drive |
| | Lakeville, MA 02347; |
| | **e-mail:** Mark.Bartow@state.ma.us; |

| | |
|---|---|
| **Legal Representative:** | Danah Tench, Deputy General Counsel |
| | MassDEP/Office of General Counsel |
| | One Winter Street |
| | Boston, MA 02108; |
| | **e-mail:** Danah.Tench@state.ma.us; |

cc:     Shaun Walsh, Chief Regional Counsel
MassDEP/Southeast Regional Office
Office of General Counsel
20 Riverside Drive
Lakeville, MA 02347
**e-mail:** Shaun.Walsh@state.ma.us;

Leslie DeFilippis, Paralegal
MassDEP/Office of General Counsel
One Winter Street
Boston, MA 02108.



**MassDEP**

Commonwealth of Massachusetts
Executive Office of Energy & Environmental Affairs

# Department of Environmental Protection

One Winter Street Boston, MA 02108 • 617-292-5500

Charles D. Baker
Governor

Karyn E. Polito
Lieutenant Governor

Matthew A. Beaton
Secretary

Martin Suuberg
Commissioner

June 22, 2017

In the Matter of
Gooseberry Island Trust and
SN Trust

Docket No. WET-2015-016
File No. SE 43-2773
Mashpee

## <u>FINAL DECISION</u>

I adopt the Recommended Final Decision of the Presiding Officer.  The parties to this proceeding are notified of their right to file a motion for reconsideration of this decision, pursuant to 310 CMR 1.01(14)(d).  The motion must be filed with the Case Administrator and served on all parties within seven business days of the postmark date of this decision.  A person who has the right to seek judicial review may appeal this decision to the Superior Court pursuant to M.G.L. c. 30A, §14(1).  The complaint must be filed in the Court within thirty days of receipt of this decision.

Martin Suuberg
Commissioner

This information is available in alternate format. Contact Michelle Waters-Ekanem, Director of Diversity/Civil Rights at 617-292-5751.
TTY# MassRelay Service 1-800-439-2370
MassDEP Website: www.mass.gov/dep
Printed on Recycled Paper