UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MATTHEW HANEY, as Trustee of the Gooseberry Island Trust, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| TOWN OF MASHPEE, and JONATHAN FURBUSH, WILLIAM BLAISEDELL, SCOTT GOLDSTEIN, NORMAN GOULD, BRADFORD PITTSLEY, and SHARON SANGELEER, as they are members and are collectively the ZONING BOARD OF APPEALS OF THE TOWN OF MASHPEE, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

CIVIL ACTION
NO. 21-10718-JGD

# MEMORANDUM OF DECISION AND ORDER
# ON DEFENDANTS' MOTION TO DISMISS

March 22, 2022

DEIN, U.S.M.J.

### I.   INTRODUCTION

Plaintiff Matthew Haney ("Haney"), as Trustee of the Gooseberry Island Trust ("Trust"), has brought this action against the Town of Mashpee ("Mashpee" or the "Town") and the members of its Zoning Board of Appeals ("ZBA") pursuant to 42 U.S.C. § 1983 alleging an unconstitutional regulatory taking of private property under the Fifth Amendment of the United States Constitution (Count I), and asking this court to exercise its supplemental jurisdiction over a claim of inverse condemnation under Article X of the Massachusetts Constitution and state common law (Count II). This is the latest in a series of administrative and court proceedings initiated by Haney relating to his attempt to construct a home on Gooseberry Island.

1

This matter is presently before the court on "Defendants' Motion to Dismiss Plaintiff's Complaint" (Docket No. 8), by which the defendants are seeking dismissal of the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  The critical issue raised by the motion is whether Haney's claims are sufficiently ripe for this court to exercise jurisdiction.  For the reasons detailed herein, the allegations of the complaint establish that no "final" decision has been reached on Haney's applications, and that the government has not "reached a conclusive position."  Pakdel v. City & Cty. of San Francisco, Cal., 141 S. Ct. 2226, 2228, 2231, 210 L. Ed. 2d 617 (2021) (per curiam).  Consequently, Haney's claims are not ripe for adjudication and the motion to dismiss is ALLOWED.

## II. STATEMENT OF FACTS

### Scope of the Record

Motions to dismiss under Rule 12(b)(6) test the sufficiency of the pleadings.  Thus, when confronted with a motion to dismiss, the court accepts as true all well-pleaded facts and draws all reasonable inferences in favor of the plaintiff.  Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).  Dismissal is only appropriate if the complaint, so viewed, fails to allege "a plausible entitlement to relief."  Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

"The plausibility inquiry necessitates a two-step pavane."  Garcia-Catalan v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir.

2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" Garcia-Catalan, 734 F.3d at 103 (quoting Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011)) (additional citation omitted). This second step requires the reviewing court to "draw on its judicial experience and common sense." Garcia-Catalan, 734 F.3d at 103 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009)). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Morales-Cruz, 676 F.3d at 224 (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010)). Finally, while the court's inquiry is focused on the sufficiency of the allegations of the complaint, courts may consider official public records, documents central to plaintiff's claims, and documents sufficiently referred to in the complaint without converting the inquiry to one of summary judgement. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

Applying these principles, the relevant facts are as follows.

## Background

The property at the center of the dispute, Gooseberry Island, is an island spanning approximately four acres in Popponesset Bay offshore from the end of Punkhorn Point Road in Mashpee (the "Island" or "Subject Property"). (Compl. (Docket No. 1) ¶¶ 2, 8, 24). In 1955, Niles Nelson purchased the Island from Fields Point Manufacturing Company as an investment. (Id. ¶ 10). The Subject Property stayed in the Nelson family until 2011, at which point Robert Nelson Jr., Niles' grandson, conveyed title to Robert Emmeluth, as trustee of the Gooseberry Island Trust, for $1,315,000. (Id. ¶¶ 13-18). Haney, the plaintiff in the instant case, later

succeeded Emmeluth as trustee. (Id. ¶ 20). The Subject Property had primarily been used as a camp for hunting and fishing prior to its conveyance to the Trust. (Id. ¶ 22). The only structure on the Island is the remnants of the foundation of a cottage. (Id. ¶ 23).

The Island is separated from the mainland by a narrow channel that fluctuates between forty and eighty feet wide depending on the high-water mark. (Id. ¶ 25). The channel's depth is less than two feet at mean low water. (Id. ¶ 26). Haney claims he has rights in the property at the end of Punkhorn Point Road through a separate trust, the SN Trust, allowing him to travel along this private road, across the property at the end, then to the water, and across the water of Popponesset Bay to the Subject Property. (Id. ¶ 27).[1] In 1908, the Board of Harbor and Land Commissioners Court had issued a license to construct a bridge from the mainland at the end of Punkhorn Point Road to the Island. (Id. ¶ 31). As detailed herein, no bridge has been built, and at the time Haney acquired the Subject Property, and today, the Island is accessed by wading across the channel. (Id. ¶ 28).

In 1960, a Mashpee Special Town Meeting placed Gooseberry Island within the R-150 Residence zone. (Id. ¶ 46). By 1985, after several amendments to the Mashpee zoning bylaws, the owner of Gooseberry Island needed a variance to build a house on the property unless the owner constructed a bridge and a road to provide frontage. (Id. ¶¶ 48-55). In 1998, Mashpee classified Gooseberry Island as "Lands of Conservation and Recreation Interest" in the Town's Local Comprehensive Plan, and in 2008, it was classified as "Private Land of Conservation

---

[1] Haney claims ownership rights in the property at the end of Punkhorn Point Road through the SN Trust. Mashpee filed a complaint in Land Court in 2014 challenging SN Trust's title to this land. (Compl. ¶ 86). The Land Court entered judgment in SN Trust's favor on October 10, 2019, and the Town has appealed. (Id. ¶¶ 86-88, 148-50). Since the distinction between the SN Trust and Gooseberry Island Trust is not relevant to the issues before the court, unless the circumstance requires otherwise, the reference to the "Trust" refers to the SN Trust and Gooseberry Island Trust either singularly or collectively.

Interest" in the Town's Open Space, Conservation and Recreation Plan. (Id. ¶¶ 56-57). The zoning restrictions and classifications were in effect at the time Haney acquired the Subject Property in 2011.

### The Mashpee Wampanoag Tribe

On May 23, 2007, the Mashpee Wampanoag Tribe ("Tribe") gained federal recognition and subsequently entered into negotiations with the Town of Mashpee for the execution of an intergovernmental agreement ("IGA") between the Town and the Tribe. (Id. ¶¶ 58-59). During the special town meeting in which the Mashpee Board of Selectmen approved an article to enter into an agreement with the Tribe, a separate article was offered to

> see if the Town will vote to authorize the Board of Selectmen to convey, grant and/or release to the Mashpee Wampanoag Tribe of Massachusetts (the "Tribe") the Town's title, rights, or interest it (sic) and to the following described parcels of real property, to file such petitions with the Massachusetts General Court as may be necessary to effect this conveyance, grant or release, and to execute any and all instruments necessary to convey, grant and for release the Town's title, interest or rights, upon such terms and conditions as the Board of Selectmen shall deem to be in the interest of the Town; provided, that the Town and the Tribe shall have first executed an Inter-Governmental Agreement specifically providing the terms of disposition of the subject title, rights and/or interests: . . . . **Parcel Seven: The parcel containing 4.6 acres, more or less, identified on Assessors Map 106, located off of Punkhorn Point and Gooseberry Island, currently utilized as a Wampanoag Aquaculture/Shellfish Farm site** . . . Parcels Seven and Eight are Wampanoag Shellfish Farms located in Popponesset Bay which, have, for several years been cultivated, maintained and harvested by the Tribe pursuant to licenses and permits granted by the Town. The Town has agreed in the Intergovernmental Agreement to convey to the Tribe any right, title or interest of the Town in these two parcels for continued aquaculture/ shellfish farm use and/or to support steps necessary for these parcels to be taken into trust for this purpose.

(Id. ¶¶ 60-62 (emphasis in original)).

Parcel Seven, as described in the article, includes the state-owned waters that surround Gooseberry Island. (Id. ¶ 63). Upon consideration of the article, Mashpee's town counsel acknowledged that the Town had "no legal right or ability to interfere with any rights or

5

interests of private property owners or the Commonwealth in these areas," and Parcel Seven was subsequently removed from the article, which ultimately passed. (Id. ¶¶ 64-65). Mashpee and the Tribe formally entered into the IGA on April 22, 2018. (Id. ¶ 66). The IGA includes language that pledges Mashpee to "support all necessary steps to have [Parcel Seven] acquired in trust for the Tribe." (Id. ¶ 67).

### 2013 Variance Applications and Initial Bridge Denial

On or about August 29, 2013, the Trust applied for three variances to Mashpee's zoning bylaws: (1) Section 174-12 – frontage on a street, (2) Section 174-31 – 150 Feet of frontage on a street, and (3) Section 174-32 – unobstructed paved access roadway. (Id. ¶ 72). After holding a hearing, the ZBA voted 4 to 1 to deny the variances. (Id. ¶ 73). In three written decisions, the ZBA explained that public safety concerns vis-à-vis the lack of a bridge between the Island and mainland compelled its decision to deny the variances. (Id. ¶ 74).[2]

To ameliorate the ZBA's public safety concerns, Haney, through Vaccaro Environmental Consulting, filed a notice of intent ("NOI") with the Mashpee Conservation Commission ("Commission") on behalf of both the SN Trust and the Gooseberry Island Trust. (Id. ¶ 75; see note 1, supra). The NOI proposed to construct a timber bridge and driveway to provide vehicle access to the Island. (Id. ¶¶ 75, 100). The Tribe opposed the bridge and other development on Gooseberry Island because it believed that it would negatively impact the Tribe's shellfish grant. (Id. ¶¶ 77, 95). The Tribe also took the position that any approvals for the bridge would violate the IGA. (Id. ¶ 96). According to the complaint, on "information and belief," the Mashpee

---

[2] As detailed infra, this decision was appealed to the Barnstable Superior Court and was subsequently consolidated with another appeal. (Def. Mem. (Docket No. 9) Ex. 7).

Board of Selectmen, based on the Tribe's opposition to the timber bridge, and allegedly improperly acting in executive session, authorized the town counsel to oppose the proposal before the Commission, which he did.  (Id. ¶¶ 82-85, 89-91).

The hearing on the NOI was continued several times, culminating in a final hearing on January 8, 2015.  (Id. ¶¶ 78, 89, 92, 94-95).  In addition to the Tribe's opposition to the bridge, at the hearing Mashpee's independent consultant noted that the proposal would not comply with the state Wetlands Protection Act ("WPA"), Mass. Gen. Laws ch. 131, § 40.  (Id. ¶¶ 95-97).[3] On January 22, 2015, the Commission rejected the proposal without prejudice, and on February 11, 2015, it issued an Order of Conditions denying the proposed timber bridge under both the WPA and the Mashpee Wetlands Protection Bylaws.  (Id. ¶ 100).

### Review of the Initial Bridge Proposal

Following the Commission's denial, the Trust filed a request for superseding review with the Massachusetts Department of Environmental Protection ("DEP") on February 12, 2015.  (Id. ¶ 103).  The DEP subsequently issued a superseding order of conditions denying the Trusts' proposal on the grounds that the "installation of sixteen 14-inch diameter piles within salt marsh would destroy 17.1 square feet of salt marsh and that the shading impacts from the bridge decking would have an adverse effect on the productivity of the salt marsh."  (Id. ¶ 104).  In response, the Trust, on July 14, 2015, requested that the DEP issue a variance from the WPA and also appealed the superseding order of conditions by requesting an adjudicatory hearing

---

[3] According to the complaint, this advice was in error and the bridge was exempt from the WPA due to the licenses issued in the early 1900's.  (Compl. ¶ 98).

7

with the Office of Appeals and Dispute Resolution ("OADR"), in accordance with 310 Mass. Code Regs. 10.05(7)(j)(2).  (Id. ¶ 105).

Prior to the OADR adjudicatory hearing, the Trust proposed replacing the disputed timber bridge with a steel bridge, which would eliminate both the piling and light issues presented by the initial proposal.  (Id. ¶ 106).  After the DEP advised that the proposed changes would address the initial reasons for denial, since the steel bridge would have no piles in the salt marsh and would allow more light to penetrate the salt marsh, the Trust revised the proposal accordingly.  (Id. ¶¶ 107-08).  After an evidentiary hearing on December 7, 2015, the DEP filed a post-hearing memorandum stating that the DEP "now supports the [Trust's] request for a Final Order of Conditions and submits that the Presiding Officer should grant the [Trust's] appeal."  (Id. ¶ 110).  However, the Commission filed its own post-hearing memorandum stating that "the [Trust's] newly-filed Plan has improperly circumvented the Plan Change Policy requirement of [thorough] local review and should be remanded to the Commission."  (Id. ¶ 111).

On June 6, 2017, the OADR issued a Recommended Final Decision holding that the Trust's new proposal could not be reviewed under the DEP's plan change policy because the steel bridge alternative was "substantially different from their originally proposed timber bridge" and must be submitted to the Commission under a new NOI.  (Id. ¶¶ 112-13).  This decision was adopted by the DEP's Commissioner on June 22, 2017 (the "DEP's Final Decision").  (Id. ¶ 114).

The Trusts appealed the DEP's Final Decision by filing a complaint seeking judicial review pursuant to the Massachusetts Administrative Procedure Act, Mass. Gen. Laws ch. 30A, § 14, on

July 21, 2017. (Id. ¶ 116). On August 2, 2019, judgment entered in Barnstable Superior Court affirming the DEP's Final Decision. (Id. ¶ 130). The Trust then appealed to the Massachusetts Appeals Court ("MAC"). (Id. ¶ 131). The MAC affirmed the Superior Court's decision on August 10, 2021, upholding the ruling that evaluation of the steel bridge proposal had to be completed by the Commission in the first instance because the steel bridge was "substantially different from the plan acted upon by the [c]onservation [c]ommission." Haney v. Dep't of Envtl. Prot., No. 19-P-1395, 2021 WL 3502072, at *2 (Mass. App. Ct. Aug. 10, 2021).

### 2018 Application for Variance and Settlement Discussions

On November 9, 2018, Haney, on behalf of the Trust, filed three new applications for variances from the Mashpee zoning bylaws for the construction of a single-family home: (1) Section 174-12 – variance from frontage on a street, (2) Section 174-32 – variance from frontage for fire department access, and (3) Section 174-31 – variance from 150-foot length of frontage. (Compl. ¶ 132). Haney claims to have made these filings to avoid "wast[ing] resources permitting and/or building a bridge if the Town would not even issue a building permit due to zoning concerns." (Id. ¶ 133). No variance was filed relating to the steel bridge proposal. The ZBA held a hearing on the matter on December 12, 2018. (Id. ¶¶ 138-39). Despite the absence of a wetlands permit, which the Trust concededly needed, Haney's new application proposed to construct a single-lane bridge that would provide pedestrian and vehicle access to Gooseberry Island. (Id. ¶ 137; Def. Mem. Ex. 7, at 4). At the hearing, the Tribe's natural resources director claimed that granting the variance would violate the IGA. (Compl. ¶ 140). After a full hearing, the ZBA voted again to deny the variances. (Id. ¶ 143). The ZBA issued written decisions explaining that the denial was based on the conclusion that

the proposed variance would not advance the Town's interest in maintaining the public safety and would, in fact, derogate from the underlying purpose and intent of the zoning bylaws. (Id. ¶ 144).

On January 8, 2019, the Trusts appealed the ZBA denials to the state court pursuant to Mass. Gen. Laws ch. 40A, § 17. (Def. Mem. (Docket No. 9) at 9, Ex. 6). Haney later moved to consolidate that appeal with the appeal of the ZBA's denial of the initial 2013 variance requests. (Def. Mem. Ex. 7; see note 2, supra). The record before this court is that those appeals are currently pending.

Haney alleges that he has reached out to Mashpee and the relevant boards to settle the variance appeals. (Compl. ¶ 151). He also alleges that Mashpee's town counsel, Patrick Costello ("Costello"), has represented to him that "any proposed settlement must be acceptable to the [Tribe]" and that "it is essential that the Tribe be on board with the construction of a bridge as a preliminary matter" for purposes of a settlement. (Id. ¶¶ 152-54). In early July 2020, Haney offered Mashpee a proposed universal settlement agreement in which he would be permitted to construct a residence only upon approval of the bridge, but Mashpee, through Costello, denied that offer, noting "the trial court and DEP appeal dispositions favorable to the Town rendered to date." (Id. ¶¶ 157-59). The Mashpee Board of Selectmen later formally considered passing an article to purchase Gooseberry Island, but the article was indefinitely postponed in October 2020. (Id. ¶¶ 160, 163-66). The following month, the Commission voted to endorse the acquisition of the Subject Property by eminent domain. (Id. ¶ 167).

In January 2021, the Mashpee Conservation Department submitted an application to the Mashpee Community Preservation Committee seeking funding to purchase Gooseberry

Island for conservation land and open space. (Id. ¶ 169). The Community Preservation Committee subsequently voted to acquire an appraisal of Gooseberry Island. (Id. ¶ 173). It is the plaintiff's contention that it would now be futile to apply for a permit for a bridge because "(i) the Town of Mashpee will not issue any permit allowing development; and (ii) there is no process to obtain a permit from the Tribe." (Id. ¶ 178).

Additional facts will be provided below as appropriate.

### III.    ANALYSIS

#### A.    Regulatory Takings Generally

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. am. V. A property owner may bring a Fifth Amendment claim under 42 U.S.C. § 1983 to seek compensation for a government violation of the Takings Clause. Knick v. Twp. of Scott, Penn., 139 S. Ct. 2162, 2177, 2014 L. Ed. 2d 558 (2019). When governmental regulations deprive a property owner of all economically beneficial uses of their property, that owner has suffered a compensable taking. Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019, 112 S. Ct. 2886, 2895, 120 L. Ed. 2d 798 (1992). "Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." Palazzolo v. Rhode Island, 533 U.S. 606, 617, 121 S. Ct. 2448, 2457, 150 L. Ed. 2d 592 (2001) (citing Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123, 98 S. Ct. 2646, 2659, 57 L. Ed. 2d 631 (1978)). "The question of what constitutes a 'taking' for purposes of the Fifth

Amendment" in the absence of a complete deprivation of all economically beneficial uses "has proved to be a problem of considerable difficulty." Penn Cent., 438 U.S. at 123, 98 S. Ct. at 2659. While the defendants argue that the facts alleged in the complaint do not rise to the level of a constitutional deprivation, this issue does not need to be resolved at this time. (See Def. Mem. at 25-28). As detailed below, the Trust's claims are not ripe for adjudication.

The Supreme Court recently held that it is no longer a requirement that a plaintiff seek compensation in state court before bringing a Takings Clause claim in federal court. Knick, 139 S. Ct. at 2177-79 (repudiating Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194, 105 S. Ct. 3108, 3120, 87 L. Ed. 2d 126 (1985)). See also Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496, 516, 102 S. Ct. 2557, 2568, 73 L. Ed. 2d 172 (1982) (plaintiffs suing under § 1983 are not required to have exhausted state administrative remedies). Nevertheless, it is still the case that "[w]hen a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has reached a 'final' decision." Pakdel, 141 S. Ct. at 2228. That is because "until the government makes up its mind, a court will be hard pressed to determine whether the plaintiff has suffered a constitutional violation." Id. While "[t]he finality requirement is relatively modest" a plaintiff must show that "there is no question about how the regulations at issue apply to the particular land in question." Id. at 2230 (internal quotation and punctuation omitted). The facts as alleged in the complaint fail to establish that there has been a final government decision on the Trust's steel bridge proposal.

### B. No "Final" Decision Has Been Made By The Town

For a regulatory takings claim under § 1983 to be "ripe" for adjudication, there must be "a final and authoritative determination of the type and intensity of development legally permitted on the subject property." MacDonald, Sommer & Frates v. Yolo Cty., 477 U.S. 340, 348, 106 S. Ct. 2561, 2566, 91 L. Ed. 2d 285 (1986). Thus, the landowner must have followed "reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law." Palazzolo, 522 U.S. at 620-21, 121 S. Ct. at 2459. Put simply, a reviewing court "cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." MacDonald, 477 U.S. at 348, 106 S. Ct. at 2566.[4]

As detailed above, in response to the denial of the 2013 requests for variances, the Trust proposed a steel bridge to address the concerns that the previously proposed wooden bridge would cause harm to the salt marsh. (Compl. ¶¶ 106-08). The DEP expressed support for this proposal. (Id. ¶ 110). However, the Commission determined that the proposal required a new NOI, as it was substantially different than the earlier proposal. (Id. ¶ 111). The need for a new proposal was confirmed by the OADR, and then by the Superior Court and the MAC. (Id. ¶¶ 112-13, 130; Haney, 2021 WL 3502072, at **2, 5). Nevertheless, the Trust has not filed any application seeking a variance based on the steel bridge proposal. Therefore, the present litigation is not ripe. Haney has not given the agencies the opportunity "to exercise their full

---

[4] State takings claims under Article X of the Massachusetts Constitution are evaluated coextensively with the federal takings analysis. Commonwealth v. Blair, 805 N.E.2d 1011, 1016, 60 Mass. App. Ct. 741, 748 (2004).

discretion in considering development plans for the property[.]" Palazzolo, 533 U.S. at 620-21, 121 S. Ct. at 2459.

### Pursuing The Steel Bridge Proposal Is Not Futile

A regulatory takings claim may proceed despite a plaintiff eschewing the relevant permitting processes when engaging in the permitting process would be "futile," such as "where special circumstances exist such that a permit application is not a 'viable option,'" or "the granting authority has dug in its heels and made it transparently clear that the permit, application or no, will not be forthcoming[.]" Gilbert v. City of Cambridge, 932 F.2d 51, 60-61 (1st Cir. 1991). The allegations of the complaint do not support a conclusion that further efforts to obtain regulatory approval would be futile.

As alleged in the complaint, the Trust filed a new application for zoning variances with the ZBA in 2018 in an attempt to determine if the ZBA would deny a variance for a single-family home regardless whether there was an approved bridge. (See Compl. ¶¶ 132-37). Since the ZBA denied the variances, it is Haney's position that there was a regulatory taking and that he has been prevented from developing the Subject Property "for a home or any other economically viable, developmental use." (Id. ¶¶ 141, 147). However, a review of the referenced ZBA December 20, 2018 decision makes it clear that the members believed that the application to the ZBA was premature, and that a final decision on the merits was not being made. (Def. Mem. Ex. 6 (Docket No. 9-6)). Thus, the members were concerned that the litigation regarding title to property was still pending, as was the litigation concerning whether the steel bridge could be considered on the merits without a new NOI. (Id. at 11). The sentiment was expressed that it was "wasteful and unnecessary" to submit new applications

while the issues raised by the pending litigation remained unresolved. (Id.). Of concern was that there was "no clear ownership to the title to the land on the mainland, and . . . no clarity from Conservation to allow the bridge to be built." (Id. at 10). Similarly, a ZBA member expressed the opinion that "[h]e could not approve something that was not approved by other departments." (Id. at 9). Without belaboring the point, there is no clear statement from the ZBA that there can never be a variance granted for the Subject Property, or that it would be futile for the Trust to seek a variance at the appropriate time. See Pakdel, 141 S. Ct. at 2231 ("[A] plaintiff's failure to properly pursue administrative procedures may render a claim unripe *if* avenues still remain for the government to clarify or change its decision." (emphasis in original)).

The Trust further argues that additional approval attempts are futile given the Tribe's opposition to a bridge, and its belief that the Town will never approve a bridge without the agreement of the Tribe because it would allegedly violate the IGA. (Pl. Mem. (Docket No. 18) at 4; Compl. ¶¶ 75-85, 151-59). However, the allegations of the complaint go no further than noting that there was opposition to the bridge proposal. There is no indication of a formal vote or binding position prohibiting the Town from issuing the variances despite the Tribe's opposition. Nor is there any reference to any opinion of counsel that a bridge would violate the IGA. In the absence of factual allegations that "the government is committed to a position" the decision is not final for takings clause purposes. Pakdel, 141 S. Ct. at 2230.[5]

---

[5] In light of the conclusion that the issues raised by the complaint are not ripe, this court will not reach the additional arguments raised by the defendants in support of their motion to dismiss.

## IV. **CONCLUSION**

For all the reasons detailed herein, "Defendants' Motion to Dismiss Plaintiff's Complaint" (Docket No. 8) is ALLOWED.  The complaint is dismissed without prejudice.

                                              / s / Judith Gail Dein
                                              Judith Gail Dein
                                              United States Magistrate Judge